**In re OSAGE CRUDE OIL PURCHASING, INC.,**
**Debtor.**

**OSAGE CRUDE OIL PURCHASING, INC., Plaintiff,**

**v.**

**OSAGE OIL AND TRANSPORTATION, INC., a corporation, Bank of Oklahoma, N.A., a national banking association, Carl Carnes, an individual, C. Dwain Carnes, an individual, Carnes Petroleum Company, a corporation, Defendants.**

**Bankruptcy No. 84–01032–W.**
**Adv. No. 85–0008–W.**

United States Bankruptcy Court, N.D. Oklahoma.

July 21, 1989.

Gary M. McDonald, and Leonard I. Pataki, Doerner, Stuart, Saunders, Daniel & Anderson, Tulsa, Okl., for plaintiff.

Ceylon S. Lewis, III, Robinson, Lewis, Orbison, Smith & Coyle, Tulsa, Okl., for the defendant, Bank of Oklahoma.

## MEMORANDUM DECISION AND ORDER

MICKEY DAN WILSON, Bankruptcy Judge.

This matter comes on for hearing pursuant to regular assignment for trial. Plaintiff presented evidence of witnesses sworn and examined and its exhibits properly admitted and thereafter the defendant proceeded to present evidence of witnesses sworn and examined and its exhibits properly submitted, and in addition the parties entered their joint trial exhibits and upon consideration thereof, the Court enters its findings of fact and conclusions of law as hereinafter set forth in accordance with Bankruptcy Rule 7052. This is a "core" proceeding under 28 U.S.C. § 157(b). Prior to commencement of trial herein the defendants, Osage Oil and Transportation, Inc. ("Transportation"), Carl Carnes and C. Dwain Carnes and Carnes Petroleum Company were dismissed with prejudice as defendants, and the sole remaining defendant is the Bank of Oklahoma, N.A. ("BOK"). The Court has previously entered its order authorizing the official Committee of Unsecured Creditors ("Committee") to prosecute this proceeding on behalf of the debtor, Osage Crude Oil Purchasing, Inc. From the evidence received the Court makes the Findings of Fact and Conclusions of Law and to the extent that any of the Court's findings of fact may be deemed or construed to set forth conclusions of law the same shall be so considered and incorporated as if fully set out herein and the reverse shall be true.

## FINDINGS OF FACT

A brief history of pertinent facts is required. Transportation has been in business in the Northern District of Oklahoma for over thirty years, having been a viable corporation under the laws of the State of Oklahoma for that length of time previously transporting crude oil and salt water for hire. Transportation eventually expanded its operations and activities to include the construction business, ownership, leasing and maintenance of gasoline storage tanks and pumping equipment; increasing its fleet of trucks and trailers for transporting hydrocarbons and related fluids; and involvement in aviation, and the purchase of real estate and construction of gasoline station outlets. Since March of 1972, Transportation and BOK have had a lending relationship involving millions of dollars.

For business reasons Transportation saw advantages in forming a separate corporation called Osage Crude Oil Purchasing, Inc. ("Crude"), and did so under the laws of the State of Oklahoma on February 23, 1981. Crude was formed by the officers, directors and shareholders of Transportation. After incorporation Crude took over the going business previously established by Transportation of the purchase of crude oil from producers and the sale of the crude oil to refiners. No payment was made concerning capitalization of Crude by Transportation or any of its officers, directors or shareholders. All of the shares of stock of Crude were held by Transportation. At all material times Transportation and Crude had the same individuals serving in the capacity of officers and directors of

both Transportation and Crude although said individuals may occupy different positions. All of the officers, directors and shareholders of both Crude and Transportation, and Transportation itself, are insiders of Crude. Crude's revenues were generated by the difference between the purchase of the crude oil and the selling of the crude oil which consisted of gathering and handling charges. At the time of the incorporation of Crude it was anticipated, and it in fact turned out to be true, that Crude's operating costs consisted of office rent, utilities, supplies, accounting services, salary of office and field personnel, costs of furnishing gauging tools and the transportation costs of hauling the crude oil from the point of purchase to the point of sale and other miscellaneous expenses. Crude's major cost was, of course, the purchase of crude oil from the producers. Very little, if any, distinction was made between administrative functions of Crude and Transportation and in fact the same people or parties furnished these services to either Transportation or Crude as may be required without discrimination as to which employee furnished services for which entity, and without proper distinction as to who paid for the same. After Crude's incorporation and prior to the filing of its petition seeking relief under the Bankruptcy Code, Crude suffered losses by virtue of the sale of oil to refining companies which thereafter discharged their obligation to Crude by filing for bankruptcy.

As previously mentioned, Transportation had a loan relationship with BOK the nature of which was that BOK granted unto Transportation a "revolving loan" wherein Transportation could draw upon the same. In addition Transportation had a "term Loan" with BOK which required monthly payments.

Transportation was, prior to the formation of Crude, performing the same functions as Crude and at the time of the incorporation of Crude, Crude assumed all of the functions of Transportation as to the purchase of oil from producers. To accomplish the intended purpose of the formation of Crude, Transportation transferred to Crude its Division Order Contracts and Purchase Contracts as well as accounts payable associated with the prior purchase of oil from producers (including payments in suspense owed to producers, suspended [but never escrowed] because of producers' title problems.) Thus at inception of Crude, Transportation owed Crude about $1,500,000.

After incorporation, Crude entered into agreements with producers for the purchase of crude oil and required such producers to execute Division Order Agreements identifying Crude as the purchaser of production, and obligating Crude to make payment to the producer therefor. Furthermore, shortly after incorporation of Crude, producers were notified by Transportation of the formation of Crude and that future business under existing division order agreements would be with Crude. William C. Jackson is a creditor of Crude who was familiar with the existence of Transportation, and who sold production to Transportation prior to the formation of Crude. Thereafter, Mr. Jackson entered into contractual agreements for the sale of production to Crude and routinely received payment for production sold from Crude. Mr. Jackson testified that he regarded Crude as a separate and distinct corporate entity and that Crude engaged in business with him in that fashion. Crude also entered into agreements with refiners to sell oil, in its own name.

The mode of operation was that Crude would purchase, pursuant to contracts with producers, crude oil and a sale would take place of said crude oil from the producers to Crude. Thereafter, Crude would sell this oil to refiners. Refiners would pay to Crude the posted purchase price of the oil plus charges for gathering, handling and transporting about the 25th day of the succeeding month after the purchase at which time Crude would immediately disburse the said funds to oil producers, retaining the gathering, transporting and handling charges as its gross profit. Crude would then have an obligation to pay Transportation for the transportation charges furnished by Transportation. At all material times both Transportation and Crude main-

tained separate banking accounts. At the time of the incorporation of Crude no steps were taken to encumber Crude assets (including its accounts receivable from refiners) to the indebtedness of Transportation in favor of BOK. At the time of Crude's incorporation BOK had classified the Transportation account as a substandard loan and a senior vice president of BOK was scrutinizing monthly profit and loss statements from Transportation; and officers of BOK were in conference with the officers and directors of Transportation at least monthly, from February, 1981, through May, 1984.

BOK and Transportation, on December 16, 1982, entered into a restated credit agreement wherein BOK agreed to loan to Transportation the sum of $4,555,057.00 as a term loan and $1,000,000.00 as a revolving loan (line of credit). The major consideration received by Transportation for this restated credit agreement was a restructuring and continuation of pre-existing loans by BOK and Transportation. These loans were secured by essentially all of the assets of Transportation including all accounts receivable generated by the purchase of crude oil (of which there were none by virtue of the fact that a separate entity, Crude, was performing this function). Crude was not a party to this restated credit agreement.

From the evidence it is obvious that both BOK and Transportation assumed that, since Transportation granted a security interest in Transportation's accounts receivable and since Crude was a wholly owned subsidiary of Transportation, this "automatically" granted BOK a security interest in Crude's accounts receivable. BOK considered these two entities as one.

At all material times BOK was aware of the acts and activities of Transportation and Crude and knew, or should have known, that Crude was in fact a separate entity. BOK was in monthly contact with Carl and Dwain Carnes, the principals of both Crude and Transportation, and received monthly financial reports from Transportation which included references to Crude as a "subsidiary." BOK also

performed field audits of the books and records of the entities. In addition Crude maintained its very active bank account with BOK, in accordance with Crude's corporate resolutions and signature cards required by BOK. BOK also handled the wire transfers into Crude's account from refiners' payments involving substantial sums of money.

Immediately before and after the restated credit agreement of December of 1982, Transportation's account was consistently overdrawn generally in the amounts of two or three million dollars and during this time Crude's account maintained a positive balance which fluctuated when Crude would receive the proceeds from the sale of oil to refiners and prior to Crude's dispensing of the sums of money to the sellers of oil to Crude.

On March 23, 1983, Transportation, Crude and BOK entered into a second restated credit agreement wherein a term loan was created in the amount of $4,692,-831.18 and the revolving loan was increased to $5,500,000.00. The consideration of this second restated credit agreement was essentially the refinancing of Transportation's then existing obligations to BOK. Security for said loans was again essentially all of Transportation's assets and, at this time, in addition, BOK procured a mortgage on real estate of Transportation's service stations. At this time Crude guaranteed all of the obligations of Transportation and pledged all of its assets to secure the obligations of Transportation including Crude's present and future accounts receivable. In addition, Carnes Petroleum Company and the officers and directors of both Crude and Transportation personally guaranteed the loan and pledged various additional assets owned by the guarantors. This second restated credit agreement also stated that Crude guaranteed and pledged its assets as additional security for a loan BOK had with Carnes Petroleum Company (in the sum of approximately $1,773,000.00 which said loan would be subsequently paid by Carnes Petroleum Company.) In January of 1983 BOK had again reclassified this loan to a grade 5 which by BOK is considered as a "doubt-

ful" loan (a grade 1 is an excellent loan, very little risk and a grade 6 is a loss.) Considerable correspondence was occurring internally at BOK concerning this loan, BOK was requesting that Transportation sell some of its assets to reduce the balances on the loans. The specialized lending department of BOK became involved in monitoring the loans. At this time Crude was profitable and Transportation was unprofitable.

In pledging essentially all of its assets to BOK for Transportation's loan and for Carnes Petroleum Company's loan, Crude received no consideration. By virtue of Crude pledging its assets for the loans of Transportation and Carnes Petroleum Company, the same effectively rendered Crude insolvent by a sum in excess of ten million dollars.

One week later, on March 29, 1983, the parties entered into another "letter" agreement, referred to as the manual balance transfer agreement, wherein effectively all of the entities appointed BOK as its agent to determine when, what, where, and how much of the funds received by any of the entities would be transferred to any of the other entities at the sole discretion of BOK. This agreement effectively allowed BOK to control the flow of money from the refiners to Crude and subsequently dispose of the same, including allowing Crude (by proper positive balances in its checking account) to pay Crude's indebtedness to the producers of the oil purchased by Crude (this manual balance transfer agreement is also referred to in the testimony as "the cash management system.") By the transfer of funds from Crude's account to Transportation's the loan of Transportation was paid to a zero balance monthly. As Crude's account became overdrawn (by the presentment for payment of checks issued to oil producers by Crude) the account would be funded by BOK by an advance on the revolving loan to Transportation and the transfer of the proceeds of the advance from the Transportation account to the Crude account. After March 30, 1983, BOK essentially controlled the movement of funds from one entity's account to another entity's account. From March 30, 1983, to July 10, 1984, approximately $116,860,000 was transferred from Crude to Transportation, and approximately $108,800,000 was transferred from Transportation to Crude, the net effect of which was that Crude paid about eight million dollars of Transportation's indebtedness to BOK (less transportation charges).

On March 23, 1983, the date of the second restated credit agreement, Transportation was overdrawn in the amount of approximately $3,877,000.00 and Crude had a positive balance of approximately $5,906,-000.00. Transportation's monthly operation reports to BOK showed a loss every month from February, 1981 to May of 1984. At the time of the execution of the letter agreement (manual balance transfer agreement) BOK immediately transferred approximately $1,700,000.00 from the Crude account to the Transportation account which said funds were partially utilized to pay the indebtedness of Transportation in favor of BOK.

In August of 1983, Transportation at the insistence and request of BOK sold substantially all of its service station operation, as well as other assets, the proceeds of which were substantially applied to the loan of BOK owed by Transportation (and guaranteed by Crude, the Carnes family individually and Carnes Petroleum Company).

On September 1, 1983, the parties entered into an amendment to the second restated credit agreement expressly reaffirming the security agreements and guarantees previously executed by the parties.

On February 24, 1984, the term loan of Transportation in favor of BOK was paid in full.

On April 30, 1984, an extension agreement was entered into by and between the parties effectively extending the second restated credit agreement as amended for one year to April 30, 1985, and again this document reaffirms the security agreements and guarantees previously executed by the parties.

On May 15, 1984, Transportation's monthly financial statement for the previ-

ous month represented an additional loss of $250,000.00 and on May 21, 1984, Crude received from the refiners for oil purchased in April of 1984 the sum of approximately $6,850,000.00 and upon receipt of this wire transfer, on May 21, 1984, BOK transferred the sum of $6,866,000.00 (pursuant to the letter agreement appointing BOK as agent for the entities) to the Transportation account; then applied $5,236,000.00 to the BOK revolving loan, paying the loan in full. In addition BOK retained $1,200,000.00 for further security for payment of any obligations which BOK may or might incur by virtue of the issuance of letters of credit (which said letters of credit have been issued by BOK for the benefit of Crude); and on May 24, 1984, pursuant to the request of the Carnes family, and the same parties in their capacity as officers of Transportation and Crude, BOK released the mortgages and security agreements held by BOK securing the loan.

Crude was unable to pay its oil producers (approximately 8,000 in number) for the sums owed for Crude's purchase of oil in April, 1984. At the behest of Crude, the proceeds from the oil purchased by Crude in May of 1984 from the producers and thereafter sold to refiners was received early and used to pay the April purchases of oil from the producers.

This left no money for Crude to pay for the oil purchased in May from producers. Crude then filed its bankruptcy petition seeking relief under Chapter 11 of the Bankruptcy Code on July 10, 1984, which said petition was authorized by the Carnes family in their position as officers and directors of Crude. The Carnes family, as officers and directors of Crude, had the obligation individually to discharge the duties of the Chapter 11 debtor and did not see fit to bring this action and upon request and after hearing, the Court, on November 16, 1984, as previously stated, authorized the official Committee of Unsecured Creditors to bring this action.

## CONCLUSIONS OF LAW

The arsenal of the trustee's avoiding powers (11 U.S.C. §§ 544 through 548) is asserted in the various causes of action by the plaintiff. The Court desires to first address plaintiff's Second Cause of Action and its invocation of 11 U.S.C. § 544(b) and the trustee's position as a successor to the rights of certain creditors. 11 U.S.C. § 544(b) provides as follows:

(b) The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

Thus this section provides that the Trustee may avoid any transfer of property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an unsecured claim. Oklahoma law provides that an unsecured creditor may avoid transfers which are fraudulent, as defined in the Uniform Fraudulent Conveyances Act which was in effect at the time of the transfers. The pertinent provisions of applicable Oklahoma law (24 Okla. Stat. § 104) provide as follows:

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without fair consideration.

In addition 24 Okla.Stat. 104 defines "fair consideration" as a fair equivalence in value between the property conveyed and the obligation owed or incurred.

█ There is no doubt that on March 23, 1983, Crude effectively pledged all of its assets to secure the obligations of Transportation thereby indebting Crude for substantial sums of money with no equivalent benefit to Crude. By the creation of this security interest, facts overwhelmingly show that Crude was in fact rendered insolvent by this conveyance. The creation of a security interest constitutes a transfer under 11 U.S.C. § 101(50) as to creditors then existing without regard to actual intent and as above mentioned the creation of this security interest, this transfer, is in fact a

transfer incurred without fair consideration. The evidence shows there is no doubt that at that time Crude had substantial numbers of creditors including, but not limited to, Mr. Jackson and 8000 or so additional creditors who were obviously affected thereby. Thus, the genesis of the scenario of events, the creation of the security interest, is in fact fraudulent; and it is undisputed that said transfer occurred within two years of the date of the filing of the bankruptcy, and within the prescribed time to bring said action as set forth in 12 Okla.Stat. 95. The creation of this security interest, by virtue of its lack of consideration in the beginning, continues to thread through the subsequent events and thus subsequent transfers continue to be tainted. By the trustee-plaintiff being able to mix and match his avoiding powers, the trustee-plaintiff may, within the statutory time as set forth in Oklahoma law, thus avoid the creation of the security interest created on March 23, 1983. It is immaterial whether or not a creditor had brought a pre-existing state court action against the debtor to set aside said fraudulent transfer as the trustee's use of this state avoidance law is allowed by 11 U.S.C. § 544(b) for the benefit of the creditors as a whole, see *In re Copter, Inc.,* 19 B.R. 588, 9 B.C.D. 16 (Bkrtcy.E.D.Pa.1982), for the trustee may assert the rights of a creditor to challenge this fraudulent transfer which is avoidable under state law absent bankruptcy, *In re Lang,* 5 B.R. 371, 6 B.C.D. 713 (Bkrtcy.S.D. N.Y.1980).

The Court next addresses the plaintiff's allegations that the subsequent transfers made pursuant to said obligations created on March 23, 1983, namely the payment to BOK on May 21, 1984, of $5,236,000.00 was in fact a fraudulent transfer as contemplated by 11 U.S.C. § 548. The language of § 548(a) specifies that transfers made or obligations incurred within one year of the date of filing of the bankruptcy petition may be avoided if the debtor—

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

This transfer was made forty-nine days preceding the filing of the bankruptcy petition by Crude. The records reveal that by virtue of the payment of the obligations by Transportation to BOK the loans were paid in full, and thereafter new loans were again created upon the advancement of funds by BOK. The Court adopts the reasoning in *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2d Cir.1981), wherein that court held that obligations are incurred on the date when the principal obligor borrows under the loan and the guarantors incur the actual obligation of repayment. The *Rubin* court noted:

[I]t does not follow that the execution of the guaranties, rather than the creation of contingent liabilities under them, constituted the incurring of the obligations for purposes of § 67(d)(2). Even after the guaranties were executed, there could be no liability under them until [the Bank] had actually loaned money to [the debtor's affiliate]. Until the loans were made, there existed only a framework through which the [debtors] might incur obligations, but they had not done so yet.

A security interest can only attach to collateral after value is given, 12A Okla.Stat. § 9–203(1)(b). Therefore, at least with respect to the approximately $6,000,000 transfer occurring between April 25, and May 18, 1984, value had not been given prior to the date a transfer was actually made. Evidence is overwhelming that Crude received minimal or no value for this particular exchange.

The rationale behind the concept of adequate consideration is outlined in *Rubin v.*

*Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2d Cir.1981), at 991:

[I]f the debtor receives property or discharges or secures an antecedent debt that is substantially equivalent in value to the property given or obligation incurred by him in exchange, then the transaction has not significantly affected his estate and his creditors have no cause to complain. By the same token, however, if the benefit of the transaction to the debtor does not substantially offset its cost to him, then his creditors have suffered, and, in the language of § 67(d), the transaction was not supported by "fair" consideration.

*Rubin* involved a situation very similar to that in the present case, since the debtor therein had granted a security interest for a debt of an affiliate. As the court explained:

[If] the debt secured by the transaction is not the debtor's own, then his giving of security will deplete his estate without bringing a corresponding value from which his creditors can benefit, and his creditors will suffer just as they would if the debtor had simply made a gift of his property or obligation. Accordingly, courts have long recognized that "(t)ransfers made to benefit third parties are clearly not made for a 'fair' consideration," and, similarly, that "a conveyance by a corporation for the benefit of an affiliate (should not) be regarded as given for fair consideration as to the creditors of the conveying corporations."

*Id* at 991, citing 4 *Collier on Bankruptcy,* ¶ 67.33, at 514.1–14.2 (14th ed. 1978).

It is undisputed that at the time of the initial corporate formation of Crude this particular business was established creating its own obligations and indebtedness as well as acquiring various assets. The purchase of hydrocarbons monthly at an approximate rate of $5,000,000 gave Crude this particular $5,000,000 asset and created obligations of Crude to the creditors (oil producers) in the sum of $5,000,000 less Crude's profit; and, upon the receipt of the moneys from the sale of the oil by Crude to refiners and ultimately the payment of the same to BOK in fact would deprive the oil producers of the assets of Crude thereby creating this fraudulent transfer. See *Steph v. Branch,* 255 F.Supp. 526 (E.D. Okla.1966).

Facts clearly show that when the transfer occurred on May 21, 1984, this rendered Crude insolvent as more fully appears by the accounting records entered into evidence. This fact was full well known by BOK.

■ Accordingly, the Court finds that the transfer made by Crude in favor of BOK in the sum of $5,236,000 is in fact a fraudulent transfer and is hereby avoided, Crude having received no or nominal value in exchange for the transfer and such transfer having rendered Crude insolvent.

■ Section 550 of Title 11 provides that recovery may be had from the direct recipient of a fraudulent transfer or any immediate or mediate transferee of such initial transferee; and, the exception asserted by the defendant, BOK, as set forth in § 550(b) does not apply, for, as aforesaid, BOK knew, or should have known, at the time of the transfer, and at all material times fourteen months next preceding the transfer, the effect of said transfer. The Court has previously found that BOK effected the transfer of May 21, 1984, pursuant to its authority contained in the "letter agreement" of March 29, 1983, which said transfer was done at the sole discretion of and for the benefit of BOK. By directing the transfer of funds from Crude's account to Transportation, BOK was clearly aware that the transfer rendered Crude insolvent. Accordingly the plaintiff may recover from this defendant the amount of the fraudulent transfer.

■ Plaintiff seeks pre-judgment interest from the date of the filing of the adversary proceeding, January 7, 1985, until paid. Pre-judgment interest is compensatory, not punitive. It is a type of real damage suffered by the defendants by virtue of the lack of use of, in this case, their money. Being aware of when concluded, this preference litigation will have lasted more than four years. Of course, the inter-

est rate during that time has fluctuated significantly. The delay has not been caused by any of the parties' misconduct but in fact has been caused by virtue of the complicated, convoluted nature of this litigation (as is more fully shown by the volumes of exhibits and the required interpretation thereof). The issue of interest in a Federal question case is governed by Federal law. Interest is not recovered according to a rigid theory of compensation withheld but is given in response to considerations of fairness. It is denied when exaction would be inequitable, *Board of County Commissioners of Jackson County v. United States*, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313 (1939); *Brock v. Richardson*, 812 F.2d 121 (3rd Cir.1987). In absence of a statutory provision to the contrary, this Court has broad discretion in whether to grant pre-judgment interest, *F.D.I.C. v. Rocket Oil Company*, 865 F.2d 1158 (10th Cir.1989). Taking all matters into consideration with equity in mind, the Court finds that plaintiff should be granted pre-judgment interest in the amount of 9.0% per annum from January 7, 1987 until date of this order. 28 U.S.C. § 1961 fixes the rate of post-judgment interest; and accordingly, judgment shall bear interest at 8.85% per annum and post-judgment interest shall be compounded annually.

In sum, plaintiff shall have and recover a judgment against the defendant, BOK, avoiding the fraudulent transfer of the sum of money acquired by the defendant, BOK, on May 21, 1984; and further that plaintiff should be, and is hereby awarded a judgment against the defendant, BOK, in the sum of $5,238,045.28 in principal with interest thereon from January 7, 1987 calculated at 9% per annum, until date of entry of judgment, and thereafter interest on the principal at the rate of 8.85% per annum from date of entry of judgment. Plaintiff shall prepare a form of judgment, F.R.C.P. 54 and 58.

AND IT IS SO ORDERED.