**In re CHASE & SANBORN CORPORATION f/k/a General Coffee Corporation, Debtor.**

**Paul C. NORDBERG, as Creditor Trustee, Plaintiff,**

v.

**ARAB BANKING CORPORATION, Defendant.**

**Bankruptcy No. 83–000889 BKC–AJC.**
**Adv. No. 86–0493 BKC–AJC–A.**

United States Bankruptcy Court,
S.D. Florida.

April 10, 1991.

Ronald G. Neiwirth, P.A., Miami, Fla., David L. Katsy, Esanu Katsky Korins & Siger, New York City, for creditor/trustee.

Alan G. Greer, Floyd, Pearson, Richman, Greer, Weil, Brumbaugh & Russomanno, Miami, Fla., Alan H. McLean, Hughes, Hubbard & Reed, New York City, for ABC.

## MEMORANDUM AND ORDER ON REMAND

A. JAY CRISTOL, Bankruptcy Judge.

THIS MATTER came before the Court on February 20, 1991, at which time the Court heard oral argument of counsel for the parties on the motion of Paul C. Nordberg, the Creditor Trustee of the Estate of the Debtor, for (1) an order fixing the amount of prejudgment interest to be paid by Arab Banking Corporation ("ABC") on two voidable preferences totalling $1,550,000 which ABC previously received, and (2) the entry of final judgment herein in the Estate's favor. ABC opposes both branches of the motion.

This proceeding is before the Court on remand from the Eleventh Circuit. *In re Chase & Sanborn Corp.*, 904 F.2d 588, 600 (11th Cir.1990). The issues before the Court on remand are the amount of prejudgment interest, if any, to which the Estate is entitled and the disposition of a counterclaim by ABC, both of which are addressed by the Creditor Trustee's motion.

## THE CREDITOR TRUSTEE'S STATEMENT OF THE BACKGROUND OF THIS PROCEEDING

ABC is a commercial bank. On March 3, 1983, the Debtor made a payment of $400,000 for principal due to ABC on a loan that ABC had made to Alberto Duque ("Duque"), who owned the Debtor. 904 F.2d at ´592. On March 31, 1983, the Debtor made a second payment to ABC of $1,150,000 for principal due to ABC on its loan to Duque. *Id.*

On May 18, 1983, the Debtor filed a petition in this Court under Chapter 11 of the Bankruptcy Code and continued to operate the business as a debtor-in-possession. In August 1984, the Creditor Trustee was appointed. On May 27, 1986, the Creditor Trustee asserted against ABC, in the form of a cross-claim in an adversary proceeding commenced by the trustee in the Colombian Coffee Co. bankruptcy, claims to recover the preferences and other voidable transfers. The Bankruptcy Court severed the Creditor Trustee's cross-claim, with leave for him to renew his claims in a separate proceeding. On July 31, 1986, the Creditor Trustee brought this adversary proceeding against ABC and renewed his claims to recover various voidable transfers, including the $1,550,000 in preferences concerned here.

The Bankruptcy Court and the District Court initially ruled against the Creditor Trustee's claims. On appeal, the Eleventh Circuit by decision dated June 27, 1990 (a) reversed with respect to the $1,550,000 in preference claims, holding that the "March 3 and March 31, 1983 loan payments by Chase & Sanborn are voidable preferences under Section 547" and "recoverable" from ABC under Section 550 as the "initial transferee" thereof, 904 F.2d at 597, 600; and (b) remanded the case to the Bankruptcy Court "for further proceedings consistent with this opinion", *id.* at 600.

By orders dated January 25 and 30, 1991, the Court granted the Creditor Trustee's motion under Section 502(d) of the Bankruptcy Code and disallowed all of ABC's

claims in this bankruptcy case, unless ABC repaid the $1,550,000 in preferences to the Estate. The Court also directed that payment of the preferences by ABC were to be held by the Creditor Trustee in an "interest-bearing segregated account." On February 13, 1991, ABC paid $1,550,000 (i.e., the principal amounts of the preferences, without any interest thereon) into such an account established by the Creditor Trustee.

The Creditor Trustee asserts that this Court has broad discretion to determine and compute the amount of prejudgment interest to be awarded on a preference and that the Court should award to the Estate prejudgment interest on the $1,550,000 in preferences (a) running from March 1983 when ABC obtained the preferences, and (b) calculated at the prime rate. The Creditor Trustee asserts that that such interest computation is appropriate in light of (1) the fact that ABC is a commercial bank and has loaned the preference amounts to bank customers for the past eight years, thereby earning for itself over $1,750,000 in interest; (2) the Congressional policy of creditor equality which underlies the preference statute and which would be violated if ABC were permitted to pocket the $1,750,000 in interest, for ABC would thereby receive the same distribution as all other unsecured creditors plus the interest it earned on the preferences and therefore receive far more than unsecured creditors who did *not* likewise receive preferences; and (3) the neutral principle of the time-value of money which calculates prejudgment interest in real economic terms and seeks to compensate a plaintiff for the loss of use of the money he recovers, but which does not punish the defendant and in the case of a preference leaves a defendant such as ABC in the same position as if it had never received the preference by requiring it to return only what it earned on the preference and nothing more.

When the Creditor Trustee commenced this adversary proceeding, ABC alleged an $11 million fraud counterclaim. The Creditor Trustee asserts that the Bankruptcy Court (Britton, C.J.) dismissed the counterclaim on the merits after trial and that

ABC was unsuccessful on the appeals to the District Court and the Eleventh Circuit in reversing Judge Britton's findings as "clearly erroneous". Separately, the Creditor Trustee also asserts that the counterclaim is barred by the principle of *res judicata* because it was alleged by ABC for the first time long *after* the confirmation of the plan of reorganization.

The Creditor Trustee asks the Court to enter final judgment in its favor for prejudgment interest and to affirm that the counterclaim is dismissed and/or barred. Even were the Court to hold that the counterclaim is viable, the Creditor Trustee asks for the entry of final judgment for prejudgment interest under Bankruptcy Rule 7054(a) and Federal Rule of Civil Procedure 54(b), on the grounds that prejudgment interest raises factual and legal questions entirely distinct from those raised by the counterclaim and that there is no just reason for delaying entry of final judgment for interest due.

## ABC'S STATEMENT OF THE BACKGROUND OF THIS PROCEEDING

On June 1, 1982, ABC loaned $22 million to Alberto Duque, Chairman of the Debtor and sole owner of Domino Investments, the Debtor's holding company parent. The Debtor guaranteed payment of the loan and received $369,288 of the loan proceeds. Duque and Camilo Bautista, the Debtor's President, provided false financial statements to ABC in order to obtain the loan. 904 F.2d at 591. On March 3, 1983, the Debtor made a payment of $400,000 for principal due to ABC. 904 F.2d at 592. On March 31, 1983, the Debtor made a second payment to ABC of $1,150,000 for principal due to ABC on its loan to Duque. *Id.*

On March 21, 1983, ABC loaned an additional $3.3 million to another Duque-owned company, Supremo Coffee Co., and another $5 million directly to Duque on May 9, 1983. No repayment on this latter total of $8.3 million was ever made. 904 F.2d at 592.

On May 18, 1983, the Debtor filed a petition in this Court under Chapter 11 of the Bankruptcy Code. Duque's control over the Debtor ceased. The bankruptcy court then appointed a financial consultant, Mr. Frederic T. Hersey, to oversee the Debtor's financial affairs. Mr. Hersey undertook a detailed investigation of all accounting and financial transactions of the Debtor that had occurred between October 1, 1982 and May 18, 1983 and in furtherance of that investigation obtained bank statements, cancelled checks, and related data directly from the appropriate banks. (Pltf's Trial Ex. 15 at 11–12.) On October 12, 1983, Sheldon Tilney, vice president of ABC, was deposed by bank creditors of the Debtor and ABC's records relating to transactions subsequently challenged by the Trustee were subpoenaed.

On November 17, 1983, ABC filed a proof of claim for $27.78 million against the estates of the Debtor, Alberto Duque, Domino Investments, Ltd., and Colombian Coffee Co. for losses incurred in connection with loans made by ABC to Duque and his companies.

In August 1984, the Creditor Trustee was appointed pursuant to the terms of the Plan of Reorganization and Creditor Trust Agreement. The Plan is a liquidating plan under Chapter 11 providing for the sale of business assets of the Debtor followed by recovery of other property, allowance or disallowance of claims, and distribution to creditors.

On May 27, 1986, the Creditor Trustee asserted against ABC, in the form of a cross-claim in an adversary proceeding commenced by the trustee in the Colombian Coffee Co. bankruptcy, claims to recover alleged preferences and other voidable transfers. The Bankruptcy Court severed the Creditor Trustee's cross-claim, with leave for him to renew his claims in a separate proceeding.

On July 31, 1986, the Creditor Trustee brought this adversary proceeding against ABC and renewed his claims to recover over $9 million in various allegedly voidable transfers, including the $1,550,000 in preferences concerned here. On August 27, 1986 ABC filed an answer and counterclaim. The counterclaim alleged that the Debtor and its officers and Chairman, Alberto Duque, had defrauded ABC into making over $30 million in loans to Duque and his companies and sought $11 million representing the total amount of credit advanced to Duque's enterprise, including interest and other charges, less partial repayments and less $19.7 million in proceeds realized on the sale of pledged collateral. The case was tried before Judge Britton on September 4, 1986.

The Bankruptcy Court ruled against all of the Creditor Trustee's claims. With respect to the counterclaim the Bankruptcy Court stated:

"Defendant has ignored its counterclaim in its trial memorandum and its supplemental trial memorandum. I am not aware of any evidence in this record offered in support of the counterclaim. If it has not been abandoned by defendant, it has been rendered moot by the remaining decisions reached in this Order. The claims' bar date in this bankruptcy case was January 16, 1984. This claim is barred, therefore, except as an offset against any recovery effected by the plaintiff against this defendant. *Slaw Construction Corp. v. Hughes Foulkrod Construction Company (In re Slaw Construction Corp.),* 17 B.R. 744, 748 (Bankr.E.D.Pa.1982). Defendant is entitled to no relief upon its counterclaim."

Cross-appeals were taken to the District Court. On December 29, 1988 the District Court affirmed the findings of the bankruptcy court regarding dismissal of the Trustee's claims, but did not address the counterclaim issues other than to acknowledge that ABC had been a victim of fraud.

Cross-appeals were again taken by the parties to the Court of Appeals. The Eleventh Circuit, by decision dated June 27, 1990, affirmed dismissal of the bulk of the Trustee's claims but reversed with respect to the $1,550,000 in preference claims, holding that the "March 3 and March 31, 1983 loan payments by Chase & Sanborn are voidable preferences under Section 547" and "recoverable" from ABC under Section

550 as the "initial transferee" thereof. 904 F.2d at 597, 600. The Court also remanded the case to the Bankruptcy Court "for further proceedings consistent with this opinion," *id.* at 600. In footnote 9 to its opinion, the Court of Appeals addressed the issue of the counterclaim as follows (904 F.2d at 593):

> "9. ABC also raised, in the bankruptcy court, a counterclaim against Chase & Sanborn in the amount of $11 million. The bankruptcy court, noting that there appeared to be no evidence supporting the claim, found it to be time-barred except as a possible offset to any recovery obtained by Chase & Sanborn. *See* Bankr. Ct. Op. at 13. Because the bankruptcy and district courts denied any recovery to Chase & Sanborn, neither court had occasion to discuss the counterclaim further. While ABC appears to have preserved the issue of the counterclaim on appeal before this Court, ABC has not explained the nature or basis of the claim before this Court, and we are not in a position to analyze its merits. We therefore leave any remaining issues involving the counterclaim to be resolved in the first instance by the bankruptcy court on remand."

By orders dated January 25 and 30, 1991, the Court granted the Creditor Trustee's motion under Section 502(d) of the Bankruptcy Code and also directed that payment of the preferences by ABC was to be held by the Creditor Trustee in an "interest-bearing segregated account." On February 12, 1991, ABC paid the $1,550,000 in preferences into an interest-bearing account designated by the Creditor Trustee.

## THE DATE FROM WHICH PREJUDGMENT INTEREST IS PAYABLE

*The Creditor Trustee's Arguments Respecting The Date From Which Prejudgment Interest Should Run*

For the reasons discussed below, the Creditor Trustee submits that prejudgment interest on the $1,550,000 in preferences should run from March 31, 1983, when the preferences were obtained by ABC.[1]

### (i) Statement Of Governing Principles And Facts

It is firmly established that this Court has broad discretion to determine and compute the amount of prejudgment interest to be awarded on a preference. *Insurance Co. of North America v. M/V Ocean Lynx*, 901 F.2d 934, 942 (11th Cir.1990) ("We review the district court's decision on whether to award pre-judgment interest for abuse of discretion."); *Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1536 (11th Cir.1987), *aff'd*, 489 U.S. 169, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989) ("It is clear that whether 'pre-judgment interest should be awarded ... [is] within the District Court's sound discretion.' "); *Payne v. Panama Canal Co.*, 607 F.2d 155, 166 (5th Cir.1979) ("In the absence of a statutory provision, the award of prejudgment interest is in the discretion of the court.... In light of the remedial and compensatory purpose, we cannot say the the district court's award of prejudgment interest constitutes an abuse of discretion."). Here, the Court's exercise of its judicial discretion in selecting the starting date for prejudgment interest should be guided by the specific facts of this case, the Congressional policies underlying the preference statute and the principle of the time-value of money.

The key facts are as follows. ABC is a commercial bank which is in the business of making loans to customers and earning profits by charging interest on those loans. ABC has had the use and benefit of the $1,550,000 in preferences since March 1983 and during that eight-year period has employed the Debtor's money to make loans to customers or otherwise support its lending business. It is undisputed that ABC, as a commercial bank, made virtually all of its loans to customers, including loans uti-

---

1. While the two preferences were in fact obtained by ABC on March 3 and March 31, 1983, for ease of calculation the Creditor Trustee treats both preferences as having been obtained by ABC on March 31, 1983 and asks that interest on both run from March 31, 1983. The use of the later date is more favorable to ABC.

lizing the preference amounts, at or above the prime rate, with the average interest rate exceeding prime.[2]

The deeply embedded policies on which the preference statute, Section 547 of the Bankruptcy Code, stands are (a) first and foremost, to ensure equality of distribution to all creditors of a debtor within the same class so that no one creditor receives a windfall and, in pursuit of such equality, to require the disgorgement by any creditor of the full value of any preference received by it; and (b) to discourage creditors from racing to dismember a debtor facing bankruptcy and thus to afford the debtor a chance to work with all of his creditors to solve his financial problems. *See, e.g., Danning v. Bozek (In re Bullion Reserve of North Am.)*, 836 F.2d 1214, 1217 (9th Cir.), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); *Yellowhouse Machinery Co. v. Mack (In re Hughes)*, 704 F.2d 820, 822 (5th Cir.1983); *Barash v. Public Fin. Corp.*, 658 F.2d 504, 508 (7th Cir.1981); 4 Collier on Bankruptcy, § 547.01 at 547–11 (15th ed.1990).

The policies behind awards of prejudgment interest in preference cases parallel the policies behind § 547 itself. In the case of prejudgment interest, the policies are to: (1) restore to the estate the full value of the preference gained by the preferred creditor; (2) prevent the unjust enrichment of the preferred creditor; (3) eliminate the preferred creditor's incentive to prolong preference litigation by eliminating any economic benefit that he might derive by holding onto the debtor's money and using it for his own benefit; and (4) compensate the debtor for his loss of use of the preference taken by the preferred creditor. *In re L & T Steel Fabricators, Inc.*, 102 B.R. 511, 521 (Bankr.M.D.La.1989); *In re Southern Industrial Banking Corp.*, 87 B.R. 518, 523 (Bankr.E.D.Tenn.1988); *In re Fulghum Construction Corp.*, 78 B.R. 146, 154 (M.D.Tenn.1987); *In re H.P. King Co., Inc.*, 64 B.R. 487, 489 (Bankr.E.D.N.C. 1986); *Ford Motor Company v. Transport Indemnity Company*, 45 B.R. 843, 847

(Bankr.E.D.Mich.1984). The Court in *Matter of Foreman Indus., Inc.*, 59 B.R. 145, 155 (Bankr.S.D.Ohio 1986), cogently synthesized these reasons for awarding prejudgment interest to a prevailing debtor in a preference case:

"[I]t is necessary to recognize that if litigation to recover a prefiling transfer is successful, recovering only the amount originally transferred is not adequate. Not only would the one creditor have received one hundred percent (100%) of the amount owed by debtor, but the creditor would also have had total control and use of the property transferred, including the opportunity to simply invest the amount in question until any litigation concerning the transfer was concluded—a situation which would not be true for other creditors. At the same time, the debtor's estate would have been deprived not only of the property transferred, to which it was rightfully entitled, but also the control and use of the property, particularly for investment purposes. In such a situation, all creditors and claimants of the estate would have had the amount they were entitled to receive diminished not merely by the wrongful transfer of the funds, but also by the continued retention of those funds."

Additionally, the Court's exercise of its discretion to set the starting date for prejudgment interest should look to the principle of the time-value of money. Prejudgment interest is no longer viewed as a penalty, but rather as "delay damages to be awarded as a component of compensation to the prevailing party". *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654 n. 10, 103 S.Ct. 2058, 2062 n. 10, 76 L.Ed.2d 211 (1983). *See also West Virginia v. United States*, 479 U.S. 305, 310 n. 2, 107 S.Ct. 702, 706 n. 2, 93 L.Ed.2d 639 (1987) ("Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby

**2.** *See* the affidavit on this motion of the Creditor Trustee, Paul C. Nordberg (hereinafter "Nordberg Aff.") at p. 6, n. 1.

achieving full compensation for the injury those damages are intended to redress"); *Insurance Co. of North America v. M/V Ocean Lynx*, 901 F.2d 934, 942 (11th Cir. 1990) ("Prejudgment interest is not a penalty, but compensation to the plaintiff for the use of funds that were rightfully his."); *Chung, Yong Il v. Overseas Navigation Co.*, 774 F.2d 1043, 1057 (11th Cir.1985) ("Prejudgment interest is not a penalty, but rather is in the nature of compensation for the use of funds."); *Lambert v. L. Luria & Son, Inc.*, 1990 WL 155540, 1990 U.S. Dist. LEXIS 15463 (M.D.Fla.1990) (where delay in proceedings caused by neither party, "an award of prejudgment interest will neither 'reward' [plaintiff] nor unfairly penalize [defendant]. This is because, during the period between [the time the cause of action arose] and the date of judgment, [defendant] had use of and presumably earned interest on $58,683 which was, in essence (and as found by the jury), [plaintiff's] money.").

The time-value of money is a neutral principle for calculating prejudgment interest in that it compensates a plaintiff for the loss of use of the money he recovers and provides a realistic economic measure of the cost of delay in recovery. *Gorenstein Enter. v. Quality Care–USA*, 874 F.2d 431, 436 (7th Cir.1989) (Posner, J.); *Lemelson v. Mattel*, 1990 WL 16785, 1990 U.S. Dist. Lexis 1267 (N.D.Ill.1990).[3] The principle does not in any way turn on notions of right or wrong and does not punish a de-

fendant. Rather, application of the principle leaves the defendant in the same economic position he was in before he obtained the plaintiff's money, for he is required to pay back only what he earned on the plaintiff's funds while he held them.

(ii) The Application Of The Governing Principles To The Facts

Based upon the principles of creditor equality and the time-value of money, ABC should pay back to the Estate prejudgment interest essentially *equal to* what it earned by lending the preference amounts to bank customers. Unless ABC returns what it earned on the preferences, the fundamental policy of creditor equality behind § 547 will be violated. This is so because otherwise one general unsecured creditor—ABC alone—will receive the same distribution as all other creditors in its class but, in addition, also pocket the interest it actually earned on the preferences. Thus, distributions to the creditors of the Estate will not, in fact, be equal.

Put differently, unless ABC is required to disgorge, by way of prejudgment interest paid to the Estate, a conservative but reasonable measure of the interest it earned, ABC will receive a huge windfall. It bears emphasis that ABC has been lending the $1,550,000 in preferences at or above the prime rate for eight years and during that period has earned for itself more than $1,775,000 (Nordberg Aff. at ¶ 10 and Exhibit 1 hereto).[4] Permitting

---

**3.** See *Prejudgment Interest: Survey And Suggestion*, 77 Northwestern U.L.Rev. 192 (1982). This article, which was cited with approval by the Supreme Court in *West Virginia v. United States, supra*, states, in material part (at 218–19): "Most of the mandatory interest regulations allow interest only from the date a complaint is filed, rather than from the date the cause of action accrues. As a result, the compensation a plaintiff receives is inadequate because it does not include interest from the date the action accrued to the date the plaintiff filed his complaint. The only possible justification for this approach harkens back to the rationale for the liquidation requirement: that is, before a plaintiff files his complaint, a defendant has no way to stop the accrual of interest. Yet the goal of interest is compensation. From the plaintiff's point of view, the date on which he files his complaint bears no relationship to the time at which he became entitled

to compensation—the date of the injury—or the amount of compensation necessary to make him whole again."

**4.** The Nordberg Affidavit computed prejudgment interest at the prime rate through December 31, 1990 and provided a per diem amount of prejudgment interest at the prime rate due thereafter. Exhibit 1 (at item 1) computes prejudgment interest at the prime rate through February 13, 1991, when ABC repaid the preferences, and sets forth the per diem amount of interest at the prime rate due thereafter. The computation of prejudgment interest in item 1 of Exhibit 1 is based on the assumptions contained in the Nordberg Affidavit at ¶ 9. (Exhibit 1, which was prepared by the Creditor Trustee and submitted for the Court's convenience, sets forth the four possible computations of prejudgment interest based on the two different starting dates (i.e., date of transfer vs. date of demand)

ABC to keep this $1,775,000 would be to transfer entirely to ABC from the other creditors the time-value of the preferences and, in a glaring violation of creditor equality, would put ABC in a far, far better economic position than every creditor who did *not* receive a preference. Congress could not possibly have intended § 547 to function in this way.

Moreover, if ABC is permitted to keep the full time-value of the $1,775,000 in interest it has earned on the preferences, its recovery from the Estate in relative terms will be many times greater than the other general unsecured creditors. The Estate presently has $4.86 million in assets (including ABC's repayment of the $1,550,000 in preferences), which if distributed at this time would mean a 9.64% dividend to general unsecured creditors, including a dividend to ABC of $530,000 based on its currently allowed claims (Nordberg Aff. at ¶ 8).[5] If ABC keeps the $1,775,000 in interest it gained on the preferences, its total recovery from the Estate will be $2,265,000 or 4.27 times as large as its recovery would otherwise be and 4.27 times larger than the recovery of a similarly situated creditor who did not receive a preference.

A principal component in determining what ABC earned on the preferences is the amount of time it held them and, accordingly, prejudgment interest should begin to run from March 31, 1983, when ABC obtained the preferences. Under the principle of the time-value of money, payment of such prejudgment interest would not punish ABC. Rather it would be left in the same position as it was when it received

the preferences, i.e., it would be no better or worse off than if it had never obtained the preferences, for it would be returning only what it gained by lending to its customers the preference amounts belonging to the Estate.[6] At the same time, consistent with the purpose of § 547, the Estate would be made whole and its many creditors treated equally.

ABC contends, as more fully discussed below, that prejudgment interest should run from the date that the trustee of a debtor demands return of a preference. Here, the Creditor Trustee demanded return of the preferences on May 27, 1986, after he uncovered ABC's receipt of them. Acceptance of ABC's argument in this case would mean that ABC would retain over *three years* of unfettered use of and income from the $1,550,000 in preferences (i.e., from March 31, 1983, when the preferences were obtained, until May 27, 1986, when the Creditor Trustee demanded their repayment). During this three year period alone, ABC received a great windfall of interest earnings totalling at least $589,000 (Nordberg Aff. at ¶ 11). This interest windfall (a) by itself more than *doubles* ABC's recovery from the Estate (so that if ABC is permitted to keep the interest, it will receive more than twice what a similarly situated, nonpreferred creditor will receive), and (b) is itself 38% of the $1,550,-000 in preferences (Nordberg Aff. at ¶ 8). Thus, allowing ABC to keep three years' earnings on preferences it should never have had in the first place would unjustly enrich ABC; defeat the Bankruptcy Code's policy of creditor equality by leaving ABC significantly better off than creditors who

---

and two rates (i.e., prime vs. federal post-judgment). ABC has not submitted a similar exhibit.)

5. The dividend to unsecured creditors and the amount of ABC's allowed claims may go up or down depending on how certain open matters are ultimately resolved, including (1) a $1.68 million claim by the Estate against Granfinanciera, S.A. and Medex Ltd.; (2) the Estate's efforts to enforce in Colombia over $8 million in judgments against Colombian entities; (3) ABC's various fraud and constructive trust claims against the Estate; and (4) a more than $750,-000 claim for attorneys' fees by ABC against the Estate (Nordberg Aff. at ¶¶ 6–7).

6. The Creditor Trustee contends that the Court should utilize the prime rate in determining the amount of prejudgment interest due (i.e., a conservative approximation of what ABC actually earned on the preference amounts). Even if the Court were to utilize the federal post-judgment rate provided under 28 U.S.C. § 1961, as ABC argues that it should, the interest accruing at that rate (which is less than ABC actually earned on its loans of the preference amounts) still creates a huge windfall of over $1,540,000 based on ABC's receipt of the preferences in March 1983 (*see* Exhibit 1 (at item 2) for such calculation).

did not receive a preference; and unfairly shift the full time-value of the preferences to ABC from the creditors of the Estate.[7]

It would be particularly inequitable here for ABC to receive a windfall at the expense of the Estate's numerous creditors. The Debtor and these creditors were the victims of massive frauds by Duque, who controlled the Debtor, and others which drove the Debtor into bankruptcy. Initially, for over a year, the Debtor was a debtor-in-possession under Chapter 11, represented by the same counsel as represented Duque, and did not aggressively pursue Duque for his misconduct, including improper payments such as the preferences to ABC (which also personally benefitted Duque). When the Creditor Trustee was appointed, he found the Debtor's records to be in a shambles and rife with incorrect postings, among other problems. *See* Nordberg Aff. at ¶ 14; *Nordberg v. Murphy (In re Chase & Sanborn Corp.)*, 55 B.R. 451, 454 (Bankr.S.D.Fla.1985). It took a period of time for the Creditor Trustee, with the help of attorneys and accountants

he retained, to sort through the records, identify claims and bring over 70 adversary proceedings, including this proceeding. *See* Nordberg Aff. at ¶ 4; 904 F.2d at 590 n. 3.[8] ABC should not benefit from these circumstances by keeping three years of interest for itself. Those profits should be returned by ABC to the Estate for the benefit of all creditors who have been injured in the fraud.

Additionally, ABC took the preferences in March 1983, just shortly before the Debtor filed its Chapter 11 petition on May 18, 1983. If ABC is permitted to keep the interest it earned on the preferences from the dates it obtained them in March 1983, other creditors in other bankruptcy situations will be encouraged by the interest windfall to pounce on financially distressed debtors, thereby precipitating the financial dismemberment that the Code was designed to prevent. Requiring ABC to return to the Estate the interest it earned from the time it obtained the preferences

---

**7.** The plain language of Section 550(a) of the Bankruptcy Code also supports the Creditor Trustee's request that prejudgment interest run from March 1983, when ABC obtained the preferences. Section 550(a) expressly provides that the debtor may recover from a preferential transferee "the value of the property" obtained by the transferee. "Value" under the Code is determined objectively. *See In re Roco Corp.*, 701 F.2d 978, 982–83 (1st Cir.1983); *In re Independent Clearing House Co.*, 77 B.R. 843, 859 (D.Utah 1987); *In re Riso*, 102 B.R. 280, 284 n. 6 and 291 (Bankr.D.N.H.1989); *In re Checkmate Stereo & Electronics, Ltd.*, 9 B.R. 585, 611–12 (Bankr.E.D.N.Y.1981), *aff'd*, 21 B.R. 402 (E.D.N.Y.1982). The most objective "value" of the preferences received by ABC is the face amounts of the preferences, *plus the full amount of the interest ABC earned by lending those preference amounts to its customers.* Any other measure would return to the Estate only part of the actual "value" received by ABC. We note that in applying the "value" provision of § 550(a) in cases involving real estate and tangible goods, the courts have directed the recovery from transferees of (i) not only the property concerned but also any and all profits the transferees gained through their use or sale of the property, or (ii) the "market value" of what was transferred. *In re Vann*, 26 B.R. 148 (S.D.Ohio 1983); *In re Nance*, 26 B.R. 105, 107 (S.D.Ohio 1982); *In re Laughlin*, 18 B.R. 778 (W.D.Mo. 1982); *In re Baker*, 17 B.R. 392, 395 (W.D.N.Y. 1982). In this way, the courts have enforced § 550(a) so as to ensure that no transferee,

including a preferred creditor, receives any windfall at the expense of general creditors of an estate and that the estate is made whole. The application of those principles here dictates that prejudgment interest should run from the time that ABC obtained the preferences, for otherwise ABC will plainly and improperly profit.

**8.** ABC claims, in substance, that the Estate and/or the Creditor Trustee should have moved sooner to recover the preferences, arguing that a year and three months before the Creditor Trustee was appointed Frederic Hersey, a court appointed consultant to the Debtor, made a detailed accounting of the Debtor's financial transactions. ABC's argument is based on an incomplete and misleading statement of the facts. Hersey was appointed to help the Debtor work itself out of bankruptcy; he was not charged with the responsibility of scrutinizing the Debtor's books and records in order to uncover and recover voidable transfers. More specifically, he examined the Debtor's books and records primarily to determine the Debtor's solvency, and his deposition testimony was submitted at trial to address that question. The Creditor Trustee is aware of nothing in the record—and ABC points to nothing—evidencing that Hersey was ever asked to search out voidable transfers, or ever knew about or reported any voidable transfer to anyone.

will uphold the second policy underpinning § 547.

The Creditor Trustee recognizes, as ABC argues, that the cases generally provide for prejudgment interest in a preference action to run from the date of a trustee's demand for payment of the preference or the date a trustee commences suit to recover the preference, whichever is earlier. The Creditor Trustee emphasizes, however, that he is aware of *no case* in this Circuit (in the Bankruptcy Court, the District Court or the Circuit Court itself)—and ABC cites none— holding that prejudgment interest must run from the date of demand or commencement of suit and may not run from the date a preference is first obtained. Rather, the cases relevant in this Circuit relied on by ABC (i.e., *Kaufman v. Tredway*, 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190 (1904) and *Palmer v. Radio Corporation of America*, 453 F.2d 1133 (5th Cir.1971)), affirm as appropriate the lower courts' exercise of discretion in running prejudgment interest in preference cases from the date of demand or suit, as opposed to ruling that it is mandatory in preference cases to do so. In neither *Kaufman* nor *Palmer* were alternative starting points for prejudgment interest even considered and neither case in any way restricts the Bankruptcy Court's broad discretion to utilize other starting dates that may be more appropriate to the facts of a particular case, such as here. Thus, this Court's discretion to set the date from which prejudgment interest should run in this case is not circumscribed by any controlling precedent in this Circuit.

The Creditor Trustee also calls to the Court's attention that he is aware of no preference case in this Circuit or elsewhere applying the date of demand or suit as the starting point for prejudgment interest that analyzed the issue in the context of the principles of creditor equality and the time-value of money. Indeed, none of the cases even considers that there could be an earlier starting date for prejudgment interest based on the policies underlying § 547 and the time-value of money and, instead, the cases largely proceed blindly from one to the next, incestuously citing one another. Moreover, the cases generally involve a relatively brief difference in time between the creditor's receipt of the preference and the trustee's demand or suit for repayment and/or a relatively small amount of money. In either event, the differences between alternative computations of prejudgment interest were generally not significant, which may explain why neither the litigants nor the courts in those cases focused on the issues raised by this motion.

The Creditor Trustee acknowledges the Eighth Circuit's decision in *Smith v. Mark Twain National Bank*, 805 F.2d 278 (8th Cir.1986), which was decided under Section 553(b) of the Code, as opposed to under Section 547, and which held that prejudgment interest should run from the date of demand or suit and not from the date of the transfer. That decision, however, is not binding precedent in this Circuit and, more importantly, is premised on flawed reasoning. First, the Court in *Smith* did not even consider the principles of creditor equality and the time-value of money in reaching its decision. It holds that prejudgment interest should run from the date of demand or suit because until then the preferred creditor "lawfully" possesses the preference. Section 547 does not impose any "demand" requirement as an element of a preference claim nor is there anything magical about the date of demand or suit. The Eighth Circuit's selection of the date of demand or suit as the starting point for prejudgment interest is arbitrary; the Court's reasoning would equally have supported the conclusion that the starting date for prejudgment interest should be the date of the first judicial decision that a preference had been obtained or the end of all appeals, on the theory that until then the preferred creditor has "lawful" possession of the preference. Conversely, the Eleventh Circuit has rejected this arbitrary notion that a claim does not exist until litigated and more logically reasoned that a cause of action arises when all the elements thereof have ripened. *See City National Bank v. General Coffee Corp.*, 828 F.2d 699 (11th Cir.1987), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988);

77 Northwestern U.L.Rev., *supra*, at 218–19. Moreover, the Eighth Circuit might well have come to a conclusion different than one it reached, if the issue here had been squarely presented to it in a preference case, or if it had had before it the arguments based on creditor equality and the time-value of money presented to this Court.

Finally, ABC argues that prejudgment interest should not run from the date a preference is obtained because (a) it is basic preference law that a demand is the event that puts a defendant on notice and establishes a plaintiff's right to payment, and (b) such a rule fairly compensates estates without penalizing preference recipients. These arguments are without substance.

ABC cites *no* case or other authority for what it says is "basic preference law." Of equal if not greater significance, one searches § 547 in vain for any hint that a "demand" for repayment is an element of a preference cause of action. ABC's position, if accepted, would engraft onto § 547 a new element of a preference. Such surgery is the role of Congress, not a litigant such as ABC.

Nor is there any merit to ABC's claim that a "demand" is necessary to avoid "penalizing" a preference recipient. The preference recipient who uses the preference amount to earn interest for himself is not penalized by being made to return only what he actually earned and nothing more. In such case, he is left in the same position as if he had never received the preference which by statute belongs and must be returned to the estate. This case might be different if ABC were an individual who had obtained a preference and put it under his mattress for safekeeping, only to find out when the trustee demanded its return that he might be liable for prejudgment interest on money on which he never earned anything. But ABC is not that individual. ABC is a commercial bank that loaned the preferences to its customers at the prime rate or better from the first day that it obtained them.

In sum, we submit that this Court should exercise its discretionary power to award prejudgment interest from March 31, 1983, when ABC obtained the preferences. Only in this way will the Congressional policy of creditor equality underlying § 547 be fully vindicated and the neutral principle of the time-value of money be fairly applied so that ABC does not substantially benefit at the expense of the Estate's numerous other creditors.

*ABC's Arguments Respecting The Date From Which Prejudgment Interest Should Run*

ABC maintains that if any prejudgment interest is awarded in this matter, it should run from May 27, 1986, the date on which the Trustee filed a cross-claim against ABC in the action brought by the trustee for the Debtor's sister corporation, Colombian Coffee Co. Inc.

There is no reason in this case for the Court to depart from the universally recognized rule in preference actions that prejudgment interest runs from the date of demand for the return of the preference, or, in the absence of a prior demand, from the date of the commencement of the adversary proceeding. *Kaufman v. Tredway*, 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190 (1904); *Smith v. Mark Twain National Bank*, 805 F.2d 278, 291 (8th Cir.1986); *Palmer v. Radio Corporation of America*, 453 F.2d 1133, 1140 (5th Cir.1971); *Salter v. Guaranty Trust Co. of Waltham*, 237 F.2d 446, 447–48 (1st Cir.1956); *Waite v. Second National Bank of Belvidere*, 168 F.2d 984, 987–88 (7th Cir.1948); *Elliotte v. American Savings Bank & Trust Co.*, 18 F.2d 460, 462 (6th Cir.1927); *In re Home*, 108 B.R. 357, 360 (Bankr.N.D.Ga.1989); *In re Gherman*, 103 B.R. 326 (Bankr.S.D.Fla. 1989); *In re Advertising Associates, Inc.*, 95 B.R. 849, 851 (Bankr.S.D.Fla.1988); *In re Gillett*, 55 B.R. 675, 680 (Bankr.S.D.Fla. 1985); *In re E.D. Presley Corp. Ltd.*, 44 B.R. 781, 784 (Bankr.S.D.Fla.1984) (rejecting date of fraudulent transfer); *Matter of Craig Oil Co.*, 31 B.R. 402, 409 (Bankr.M. D.Ga.1983), *aff'd*, 785 F.2d 1563 (11th Cir. 1986) (award from demand date not date of each avoidable transfer). *See generally* 4

Collier on Bankruptcy ¶ 550.02, at 550–6 to –7 (15th ed.1990); 3 Collier on Bankruptcy ¶ 60.63[1] at 1129 (14th ed.1977); Annot., Interest on Preferential Payment Recovered by Trustee in Bankruptcy, 4 A.L.R.2d 327 (1949).

Indeed, the departure from the rule which the Trustee now advocates has been held to be *reversible error. Smith v. Mark Twain National Bank,* 805 F.2d 278, 291 (8th Cir.1986) (reversing award of prejudgment interest granted from transfer date); *Waite v. Second National Bank of Belvidere, Ill.,* 168 F.2d 984, 987–88 (7th Cir.1948) (same); *White Company v. Wells,* 42 F.2d 460 (6th Cir.1930) (same).

The basis for this universally accepted rule is explained by the Court of Appeals for the Eighth Circuit, *reversing* an award of prejudgment interest which accrued from the date of the transfer instead of the date of demand:

"A transaction which results in *a voidable preference is lawful when made* but subject to the possibility of being defeated by subsequent events. It continues to be lawful unless it is followed by the filing of a bankruptcy petition within 90 days. *It continues to be lawful* after that time *unless the trustee elects to avoid it. Until the trustee exercises his election and makes demand for the transfer, the creditor's possession of the property is proper."* (Emphasis supplied.)

*Smith v. Mark Twain National Bank,* 805 F.2d 278, 291 (8th Cir.1986) (quoting *In re Independent Clearing House Co.,* 41 B.R. 985, 1015 (Bankr.Utah 1984), *aff'd in part, rev'd in part,* 62 B.R. 118 (D.Utah 1986)). *See also, Iderstine v. National Discount Company,* 227 U.S. 575, 580, 33 S.Ct. 343, 344, 57 L.Ed. 652, 654 (1913), *In re Production Steel, Inc.,* 60 B.R. 4, 5 (Bankr.M.D. Tenn.1986); *In re Demetralis,* 57 B.R. 278 (Bankr.N.D.Ill.1986); *In re Roco,* 37 B.R. 770, 774 (Bankr.D.R.I.1984).

Thus, although the Trustee argues that interest should run from *the date the cause of action accrues,* in a preference situation the cause of action does not accrue as of the date of transfer. No claim could have been brought by the Debtor or the Trustee on that date. The cause of action to void a preference does not accrue until the Trustee has made a demand. *Smith v. Mark Twain National Bank, supra.*

In the preference context, adopting the Trustee's novel theory that interest begins to accrue from the date of transfer would unfairly penalize defendants who properly receive payments of debts lawfully due and would unjustly enrich other creditors of the debtor's estate by distributing to them the income legitimately earned by the preference defendant prior to bankruptcy and prior to any demand.

The Trustee is simply in error when he contends that preference recipients are "unjustly enriched at the expense of the estate" prior to the Trustee's demand or that the interest earned by ABC is in some way a "distribution" to ABC of property of the estate. ABC's earnings, if any, are not property of the estate because the payments made to it were lawful when made. Prejudgment interest is intended to compensate the estate for what *it* would have earned on the same principal amount if the alleged preference had been returned on demand. There is no merit in law or fact to the Trustee's argument that ABC wrongfully profited from the retention of a lawful preference payment prior to demand. *Smith v. Mark Twain National Bank, supra,* 805 F.2d at 294.

The Supreme Court has declared that in deciding if and how much prejudgment interest should be granted, the trial court must reexamine "matters encompassed within the merits of the underlying action." *Osterneck v. Ernst & Whinney,* 489 U.S. 169, 176, 109 S.Ct. 987, 991, 103 L.Ed.2d 146, 155 (1989). Nothing in the merits of this case indicates any unusual circumstances which might justify accrual of prejudgment interest from the date of the transfers. Indeed, *the three courts which have reviewed this case have each acknowledged that ABC acted in good faith* in accepting the transfers and have each rejected the Trustee's claims that the transfers were fraudulent under 11 U.S.C.

§ 548. *In re Chase & Sanborn Corporation*, No. 86–0493–BKC–TCB–A (Bankr.S. D.Fla. Sept. 19, 1986) (hereafter "Bkr. Ct. Op.") at 4–5, 10–11; *In re Chase & Sanborn Corporation*, No. 86–2575–Civ–Scott (S.D.Fla. December 29, 1988) (hereafter "Dist. Ct. Op.") at 11–12, 17–18; *In re Chase & Sanborn Corporation*, 904 F.2d 588, 593–95, 600 n. 28 (11th Cir.1990).

Thus, cases of blatant fraud or bad faith in connection with a challenged transfer are not applicable here. *See In re L & T Steel Fabricators, Inc.*, 102 B.R. 511, 522–23 (Bankr.M.D.La.1989) *(where Bank's conduct was not fraudulent or in bad faith, interest was not awarded on preference recovery during 17–18 month period prior to Trustee's filing of preference complaint)*; *In re E.D. Presley Corp.*, 44 B.R. 781, 784 (Bankr.S.D.Fla.1984); *In re Production Steel, Inc., supra*; *In re Roco Corp., supra*.

Nor is there any merit to the Trustee's argument that failure to compute interest from the date of transfer "encourages banks in Arab's position to pounce on distressed debtors so that they may obtain *interest* windfalls." The trial record shows that the obligation to make installment payments on ABC's $22 million loan to Duque was *extended* by ABC and after the preference transfers, ABC loaned $8.3 million more to Duque and his companies, much of which was used by this debtor to pay its obligations to other creditors. Dist. Ct. Op. at 14, 17; Transcript of Hearing before Bankruptcy Court on September 4, 1986 at 99–100, 107, 110. Although the Trustee argues that the equities of the case are with the Debtor and its creditors because the Debtor was a victim of "massive frauds by Duque," *ABC* is the victim of fraud in this case as the District Court and Court of Appeals recognized. *In re Chase & Sanborn Corp., supra*, 904 F.2d at 591–592 (Duque and Bautista "sought a $22 million loan for Duque from ABC. They provided false financial statements to ABC in order to obtain the loan. * * * Duque was later convicted of 62 fraud-related counts in connection with his financial dealings, and is currently imprisoned.")

The Trustee's argument that the term "value" in 11 U.S.C. Section 550 requires an award of prejudgment interest accruing on the date of a pre-petition transfer was explicitly rejected in *In re Production Steel, Inc., supra*. Furthermore, the cases cited by the Trustee, all but one involving fraudulent transfers, do not discuss profits or interest as part of the "value" of recovered property, but seek merely to determine the fair market value of *tangible assets at the time they were transferred:* *In re Nance*, 26 B.R. 105 (Bankr.S.D.Ohio 1982) (the value of fraudulently conveyed real property); *In re Laughlin*, 18 B.R. 778 (Bankr.W.D.Mo.1982), (value of real property); *In re Baker*, 17 B.R. 392 (Bankr.W.D. N.Y.1982) (value of a yacht); *In re Vann*, 26 B.R. 148 (Bankr.S.D.Ohio 1983), (value of tires). No authority is cited by the Trustee for his contention that the "value" of a cash transfer includes interest subsequently earned by the transferee. Indeed, ABC has, pursuant to the Court's January 30, 1991 Section 502(d) order, already paid to the estate the "value" of the preferential transfers herein.

Finally, it cannot be maintained that ABC either contributed to delay in commencement of this litigation or prolonged its ultimate resolution. Although ABC was first deposed in this bankruptcy case on the facts regarding challenged transfers on October 12, 1983, within five months of the filing date, no demand for return of alleged preferences was made until May 27, 1986.[9]

---

9. The trial evidence in this case shows that for the one year and three months prior to the appointment of the Trustee, the financial affairs of the Debtor were managed by a court appointed financial consultant, Mr. Frederic T. Hersey, who, upon his appointment in May 1983, promptly undertook a "detailed transaction by transaction analysis of all of the accounting and financial transactions that occurred between October 1, 1982 and May 18, 1983" and in furtherance of that investigation, Mr. Hersey obtained bank statements, cancelled checks, and related data "directly from the appropriate banks." Deposition of Frederic T. Hersey, August 25, 1986, Pltf's Trial Ex. 15, Deft's Trial Ex. R at 11–12. On October 12, 1983, at the time when Mr. Hersey and his staff were reconstructing the debtor's financial affairs, the lead bank creditors of the debtor deposed Sheldon Tilney, vice-president of ABC, concerning numerous trans-

Thereafter, the Trustee's claims were tried to judgment by the bankruptcy court within slightly more than 30 days from commencement of the action. The bankruptcy court completely vindicated ABC of the "blizzard of charges" contained in the Trustee's 98–paragraph complaint for the return of over $9 million in allegedly avoidable transfers. Bankr. Ct. Op. at 2. The district court affirmed the judgment of the bankruptcy court, as did the Court of Appeals, with the exception of the two transfers at issue here. Thus, the years spent on this case are not the result of recalcitrance or delay by ABC, but rather derive from the Trustee's initial failure to make a prompt demand and his repeated appeals from court decisions which entirely rejected his "blizzard of charges."

*The Court's Opinion Respecting The Date From Which Prejudgment Interest Should Run*

■ The Court is of the opinion that prejudgment interest on the $1,550,000 in preferences should run from <u>date of demand</u>, on May 27, 1986.

## HOW PREJUDGMENT INTEREST SHOULD BE CALCULATED

*The Creditor Trustee's Arguments Respecting How Prejudgment Interest Should Be Calculated*

For the reasons set forth below, the Creditor Trustee submits that prejudgment interest on the $1,550,000 in preferences should be computed at the prime rate (as stated in the Wall Street Journal) [10] in effect at six-month intervals from March 31, 1983 (when the preferences were received), with interest compounded every six months.[11]

The application of the prime rate is supported by the same considerations which support the running of prejudgment interest from the time ABC received the preferences. Specifically, these considerations are the Court's judicial discretion to fix prejudgment interest as informed by the facts of this case, the policy of creditor equality central to the preference statute and the principle of the time-value of money.

The Creditor Trustee underscores that the courts have broadly exercised their judicial discretion in selecting the rate for computing prejudgment interest in cases involving voidable transfers and other claims and have chosen a variety of rates. *See, e.g., In re Henry Gherman,* 103 B.R. 326, 333 (Bankr.S.D.Fla.1989) (federal post-judgment rate under 28 U.S.C. § 1961); *Matter of Foreman Indus., Inc., supra,* 59 B.R. at 156 (federal post-judgment rate under § 1961 on a "fluctuating" basis); *Tavormina v. Merchants Bank (In re Gillett),* 55 B.R. 675, 680 (Bankr.S.D.Fla.1985) (12% legal rate under Fla. Stat. § 687.01); *Moxness Products, Inc. v. Xomed, Inc.,* 1988 WL 193213, 1988 U.S. Dist. LEXIS 16062, 8 U.S.P.Q.2d (BNA) 1281 (M.D.Fla. 1988), *rev'd in part, aff'd in part and remanded in part on other grounds,* 891 F.2d 890 (Fed.Cir.1989) (average of prime rate from filing date to judgment date); *In re: Osage Crude Oil Purchasing, Inc.,* 103 B.R. 256 (Bankr.N.D.Okla.1989) (9%, which was slightly more than the post-judgment rate then in effect). While the federal post-judgment rate under § 1961 is often used, it is by no means compulsory in preference litigations, *see In re Southern Industrial Banking Corp., supra,* 87 B.R. at

fers by the debtor and Alberto Duque and subpoenaed ABC's records concerning many of the transfers which later were challenged by the Trustee. Thus, the Trustee or his predecessor, Mr. Hersey, were aware of relevant facts or in a position to conduct an in depth investigation two and one-half years before any demand was made on ABC for return of preferences.

10. The interest computations contained in the Nordberg Affidavit and Exhibit 1 (at items 1 and 3) are based on the prime rates published in the Wall Street Journal.

11. The Creditor Trustee asks the Court to apply the prime rate in effect at six-month intervals, with interest compounded every six months, as that is a conservative estimate of the way in which ABC charged the prime rate to bank customers. He submits that, if anything, this method of computation results in interest substantially lower than that actually charged by ABC to its customers.

523; *E.E.O.C. v. Wooster Brush Co. Employees Relief Ass'n.*, 727 F.2d 566, 579 (6th Cir.1984), especially where the "equities of the particular case require a different rate". *In re H.P. King Co., Inc., supra*, 64 B.R. at 491. *See also Western Pacific Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1289 (9th Cir.1984). Moreover, there is *no case* in this Circuit (in the Bankruptcy Court, the District Court or the Circuit Court itself) or in any other Circuit—and ABC cites none—holding that prejudgment interest on a preference may not be awarded at the prime rate.

In exercising its discretion to select the interest rate for computing prejudgment interest, the Court should first consider that unless prejudgment interest is calculated at the prime rate, ABC will be exalted over the other general creditors in violation of the policy of creditor equality. ABC, a commercial bank, loaned the preference amounts to its customers at or above the prime rate.[12] To the extent that ABC is permitted to keep all or any substantial part of the interest it earned, it will receive a significant business advantage and gain denied to all the creditors who did not receive a preference.[13]

Additionally, the neutral principle of the time-value of money further strongly supports the application of the prime rate and, in fact, has often been employed to fix prejudgment interest in cases, such as this one, where there is no governing statutory interest rate. In its recent decision in *Gorenstein Enter. v. Quality Care—USA, supra*, 874 F.2d at 436, the Seventh Circuit, in awarding compound prejudgment interest at the prime rate in a franchise and trademark case, succinctly set forth why the prime rate should be utilized to fix prejudgment interest where there is no applicable statutory rate:

"For the future, we suggest that district judges use the prime rate for fixing prejudgment interest where there is no statutory interest rate. That is a readily ascertainable figure which provides a reasonable although rough estimate of the interest rate necessary to compensate plaintiffs not only for the loss of the use of their money but also for the risk of default."

*See also Lemelson v. Mattel, supra* (following the Seventh Circuit's decision in *Gorenstein Enterprises* and awarding prejudgment interest at the prime rate in a patent case because prime "provides a reasonable estimate of the interest rate necessary to compensate the plaintiff for the loss of the use of money and for the risk of default").

The facts of this case fall squarely under the reasoning in *Gorenstein Enterprises*. The prime rate needs to be applied to make the Estate whole based on its loss of use of the preference amounts since March 1983. In addition, the prime rate needs to be applied to compensate the Estate for the "risk" that ABC will "default" in paying any prejudgment interest awarded against it. This risk is real. In January 1991, the rating of ABC's long-term debt and certificates of deposit was significantly downgraded by Standard & Poor's from A– to BBB to reflect, among other things, "reduced profitability" and "diminished liquidity". *The Financial Times*, January 8, 1991 at p. 25; *The Business Wire*, January 7, 1991. The Creditor Trustee's concern about the collectibility of prejudgment interest awarded by the Court against ABC is heightened, given the current grave situation in the Persian Gulf, by the fact that ABC is owned by the governments of Libya, Kuwait and Emirate of Abu Dhabi. 904 F.2d at 590 n. 2.

---

**12.** The Creditor Trustee asks on this motion only that ABC pay prejudgment interest at the prime rate, not a rate above prime. Accordingly, the utilization of the prime rate to estimate the interest that ABC earned on the preferences is a conservative assumption, tending to understate the true amount of interest that ABC earned.

**13.** Section 550(a) additionally supports the application of the prime rate for the same reasons it supports having prejudgment interest run from the date a preference is obtained. In order for the Estate to recover from ABC the full "value" of the preferences ABC obtained, ABC must return all that it earned by lending the preference amounts at or above the prime rate.

While ABC acknowledges the precipitous drop in its credit rating, it argues that this does not increase the risk it will default in paying prejudgment interest because it still has an investment grade rating (albeit just barely) and because it "promptly paid" the Estate the $1,550,000 ordered by the Court. ABC's argument, however, ignores several undisputed facts. For one thing, a drop in credit rating by definition means a heightened risk of default, particularly where, as here, the reduction was substantially due to ABC's "reduced profitability" and "diminished liquidity." ABC's argument also ignores that the bank is owned by Libya, Kuwait and Abu Dhabi. The war in the Persian Gulf, as well as the prior hostilities with Libya, creates financial uncertainties for institutions such as ABC. Indeed, the credit rating reduction for ABC reflects the financial world's very real concerns that the assets of ABC may become frozen, unavailable to American claimants or dissipated by other claimants or bank losses. Further, the $1,550,000 payment by ABC was hardly "prompt" or "voluntary." The Eleventh Circuit on June 27, 1990 held that ABC had to return the $1,550,000 in preferences. It took over 7½ months and two motions by the Creditor Trustee under § 502(d) before ABC finally paid the $1,550,000, and ABC did so only after this Court granted the Creditor Trustee's § 502(d) motion and directed that ABC's claims would be disallowed unless it paid when it did.

The Creditor Trustee notes that the rulings in *Gorenstein Enterprises* and *Lemelson v. Mattel* are only the most recent decisions in a trend in the federal courts in cases against financial institutions and others to award prejudgment interest at the prime rate so as to compensate a plaintiff fairly for his loss of use of money, i.e., to give a plaintiff prejudgment interest measured by the time-value of money. Others include:

(1) *Peterson v. Crown Fin. Corp.*, 553 F.Supp. 114 (E.D.Pa.1982). A borrower brought suit against a financial institution (Crown) for restitution of an amount paid on a note by the borrower under protest. The court awarded plaintiff prejudgment interest at 2% above the prime rate, reasoning as follows:

"... Crown has had the use of the money to make further loans at rates presumably in the neighborhood of the 2½ points above prime which Crown charged plaintiff for the loan which is the root of this litigation ... Unless a rate of interest is assessed which is steep enough to force Crown to disgorge any profit it has made by the use of plaintiff's money, and to compensate plaintiff for the costs he encountered as a result of Crown's action, Crown will have profited from its wrongful act and plaintiff will remain, despite a judgment on the merits, a substantial loser in the controversy."

*Id.* at 116.

(2) *Jefferson Nat. Bank v. Central Nat. Bank in Chicago*, 700 F.2d 1143, 1155 (7th Cir.1983) (bank trustee directed to return funds the bank had taken from the estate and, in addition, to pay interest at the prime rate reflecting "the amount of income received by [the bank] on monies properly attributable to and improperly denied to [the] Estate during the period at issue").

(3) *Alberti v. Klevenhagen*, 896 F.2d 927, 938, *partially vacated on other grounds*, 903 F.2d 352 (5th Cir.1990) (granting attorneys' fees and awarding prejudgment interest thereon at the prime rate: " ... the appropriate rate of interest to be used in computing a delay in payment adjustment is the cost of borrowing money, the prime rate").

(4) *Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984) (awarding prejudgment interest at the prime rate in an ERISA case: "Expert testimony revealed that at the time of the Bancorporation loan 'several hundred' other banking institutions were in the market to borrow at a rate of prime plus one percent. Awarding prejudgment interest in accord with prevailing interest rates is consistent with prior case law").

(5) *General Facilities v. Nat. Marine Ser.*, 664 F.2d 672 (8th Cir.1981). In af-

firming the trial court's award in an admiralty case of prejudgment interest of 15.75%, the Eighth Circuit held:

> "In arriving at 15.75 percent, the trial court relied upon the average prime interest rate during the relevant period, as adduced at trial. This is an attempt to approximate the implicit cost to Conoco of its money losses and the benefit to National Marine from use of such monies. Although the average prime rate is not the only possible standard, we cannot say it is unreasonable or an abuse of discretion to follow it as a guide."

*Id.* at 674.

(6) *Datascope Corp. v. SMEC*, 1988 WL 88049, 1988 U.S. Dist. LEXIS 9245 (D.N.J. 1988) (awarding compound prejudgment interest at the prime rate in a patent case).

(7) *Zurich Ins. Co. v. Pateman*, 692 F.Supp. 371, 380 (D.N.J.1987) (parties in an admiralty case stipulated to prejudgment interest at "prime interest rate" of 10.5%).

(8) *Studiengesellschaft Kohle m.b.H. v. Dart Indus., Inc.*, 666 F.Supp. 674, 697 (D.Del.1987), *aff'd*, 862 F.2d 1564 (Fed.Cir. 1988) (awarding prejudgment interest at prime rate in a patent case "to pay back to the patentee the money that the infringer earned—the interest—on money that rightfully belonged to the patentee").

(9) *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 644 and n. 7 (W.D.Wisc. 1979) (ERISA case awarding prejudgment interest "compounded and adjusted quarterly at the prime rate of the First National Bank of Chicago" which "is a fair measure of the cost of money over recent years ...").

(10) *Employer–Teamsters, Joint Council No. 84, Health and Welfare Fund v. Weatherall Concrete, Inc.*, 468 F.Supp. 1167, 1171 (S.D.W.Va.1979) ("In awarding prejudgment interest, it is appropriate for the court to allow prejudgment interest at such a rate as will compensate Plaintiffs for the delay in the receipt of their money ... For interest is to be computed not at the legal rate fixed by statute, but at the rate Plaintiffs would have to pay upon a loan of a similar amount. The Court may take into consideration the state of the money market and the rate charged by banks for the use of money").

Thus, an award of prejudgment interest computed at the prime rate, which takes into account the time-value of money, is fully supported by growing precedent in the federal courts.

Finally, ABC contends that while prejudgment interest on a preference generally should be computed at the federal postjudgment statutory rate under 28 U.S.C. § 1961, in this case prejudgment interest should be reduced even *below* that rate. ABC's main argument is that prejudgment interest should be reduced because ABC was defrauded into making the loan which underlies the preferences and that it would therefore be inequitable to require ABC to pay prejudgment interest even at the federal post-judgment rate. The facts and law do not support ABC's position. ABC, as its own bank officer, Sheldon Tilney, conceded at trial, was defrauded by Duque and Camillo Bautista and *not* by the Debtor (Trial Tr. at 113–114) or, more importantly, by its numerous innocent creditors who are the real parties in interest, as represented by the Creditor Trustee, on this motion. In fact, the Debtor and its creditors were *victims* of Duque and Bautista whose fraudulent acts drove the Debtor into bankruptcy and have left the creditors facing a dividend in bankruptcy of less than 10 cents. Even if ABC had been defrauded by the Debtor, it would not help ABC here. The fraud of the bankrupt is not the burden of the trustee who acts for the estate's creditors or of the innocent creditors themselves. *In re Davis*, 785 F.2d 926 (11th Cir.1986). There is utterly no basis for prejudicing the Estate's creditors any further by shifting any more of the time-value of the preferences to ABC through a reduced prejudgment interest rate on the preferences.

ABC also claims that reduced interest is warranted because Judge Britton, according to ABC, found that the Creditor Trustee delayed this proceeding by "bringing a blizzard of charges" and otherwise delayed. This charge is unsupported by the facts. As detailed above, the Creditor Trustee

upon his appointment hired accountants and lawyers to assist him in reviewing the Debtor's voluminous but spotty and error-ridden records, and moved forward conscientiously and responsibly in bringing this adversary proceeding, among over 70 other such proceedings. The "blizzard" referred to by Judge Britton in his September 19, 1986 decision in this proceeding (CP 27) was a reference not to the Creditor Trustee alone, as implied by ABC, but to both the Creditor Trustee and ABC. Specifically, Judge Britton stated: "The 98–paragraph complaint and the 81–paragraph answer and counterclaim together with the parties' trial memoranda, respectively 36 and 27 pages, present a blizzard of charges based upon alternative theories, denials and affirmative defenses, raising, I think, every conceivable factual and legal argument." The vigorous litigation of this proceeding by both sides is no basis for punishing the creditors of the Estate by reducing the prejudgment interest to be paid by ABC to the Estate. To reduce such interest would merely enrich ABC at the creditors' expense.

ABC further claims that prejudgment interest should be reduced because the interest requested exceeds the amount of the preferences and, according to ABC, is therefore punitive. ABC is mistaken. Prejudgment interest has risen to exceed the amount of the preferences only because ABC has held and used the preferences for its own benefit for eight years. The decision to keep the preferences (and to continue to earn interest on them) was ABC's alone. If ABC had returned the preferences earlier, it would owe far less interest. The neutral principle of the time-value of money remains controlling here. ABC is only being asked to return what it gained by using the Estate's money. There is no justification for allowing ABC, at the expense of the Estate's creditors, to keep the interest ABC earned on the preferences belonging to the Estate.

ABC additionally claims that interest should be reduced because its defense against the preferences was not frivolous and raised substantial issues. This argument overlooks that the Estate was burdened with significant costs over the four years in which it took the preference issues to trial and through two appeals to the Eleventh Circuit where the Estate prevailed. It would be inequitable to punish the Estate by reducing its prejudgment interest recovery where it persevered at its own expense. ABC's argument also ultimately overlooks that the Eleventh Circuit rejected *all* of ABC's "blizzard of defenses" to the preference claims.

In a last argument, ABC seeks to reduce its obligation to pay prejudgment interest even further by contending that it should not have to pay *any* interest for the period after February 13, 1991, the date on which ABC paid $1,550,000 pursuant to the Court's order on the § 502(d) motion. ABC's position is both contrary to settled law and inequitable. The law is clear that where a party owes both principal and interest and makes a partial payment on that obligation, the payment is applied first to repay the interest owed and then any excess is applied to reduce the principal; the unpaid balance of the principal thereafter continues to accrue interest. *Southern Natural Gas Co. v. Pursue Energy*, 781 F.2d 1079, 1088 n. 11 (5th Cir.1986); *Aviation Credit Corp. v. Conner Air Lines, Inc.*, 307 F.2d 685, 688 (5th Cir.1962), *cert. denied*, 371 U.S. 954, 83 S.Ct. 510, 9 L.Ed.2d 501 (1963). ABC's position is highly inequitable because it would give ABC interest-free use of the balance of the Estate's money that it continues to hold for as long as this litigation pends. This would obviously give ABC a further incentive to drag this litigation out as long as possible.

ABC's argument that the rule of law governing the allocation of partial payments should be modified based on the "intention of the parties" is founded on a misreading of the *Aviation* case and, in all events, is without any factual support here. The language ABC quoted from *Aviation* concerns a completely different issue in that case—the interpretation of a supersedeas bond—and not to the legal rule as to how to allocate partial payments on combined interest and principal obligations. Moreover, it was never the intention of the

parties or the Court on the § 502(d) motion that ABC's payment would terminate its obligation to pay interest; that proposition was never even suggested, let alone litigated, on the § 502(d) motion.

In sum, on the facts here, only the application of the prime rate will achieve the Congressional goal of creditor equality and carry through the principle of the time-value of money. This is so because only the utilization of the prime rate will compel ABC to surrender a fair approximation of what it earned on the preference amounts over the last eight years, thereby assuring equal treatment of all of the Estate's unsecured creditors and making the Estate whole for its loss of use of the preferences since March 1983. The Court should exercise its discretionary judicial power to award prejudgment interest at the prime rate.[14]

*ABC's Arguments Respecting How Prejudgment Interest Should Be Calculated*

There is no reason to depart from the overwhelming precedent in this circuit and elsewhere that has adopted the federal statutory rate of *post*-judgment interest, 28 U.S.C. § 1961(a), which rate was in effect either as of the date of the judgment or immediately prior to the date of demand for the return of the preference, as the appropriate means of (1) *fairly compensating* plaintiffs for any loss of use of money, and (2) establishing *uniformity in judgments*. *E.E.O.C. v. Guardian Pools, Inc.*, 828 F.2d 1507, 1512 (11th Cir.1987) (prejudgment interest at "IRS prime rates" on back pay award); *In re Home*, 108 B.R. 357, 366 (Bankr.N.D.Ga.1989); *In re Gherman*, 103 B.R. 326 (Bankr.S.D.Fla.1989); *Matter of Sims Office Supply, Inc.*, 94 B.R. 744, 748 (Bankr.M.D.Fla.1988); *In re Advertising Associates Inc.*, 95 B.R. 849, 851 (Bankr.S.D.Fla.1989); *In re E.D. Pres-*

*ley Corp. Ltd.*, 44 B.R. 781, 784 (Bankr.S. D.Fla.1984) (rejecting application of state interest rate from date of transfer). The Trustee's statement that courts have chosen a variety of rates in computing prejudgment interest in preference cases is untrue. The authorities cited by the Trustee which adopt rates other than contained in 28 U.S.C. § 1961 are *not* preference cases. *Tavormina v. Merchants Bank (In re Gillett)*, 55 B.R. 675, 680 (Bankr.S.D.Fla. 1985) (state rate of interest in turnover action governed by state law); *Moxness Products, Inc. v. Xomed, Inc.*, 1988 WL 193213, 1988 U.S. Dist. LEXIS 16062, 8 U.S.P.Q.2d (BNA) 1281 (M.D.Fla.1988) *rev'd in part, aff'd in part*, 891 F.2d 890 (Fed.Cir.1989) (patent infringement claim); *In re Osage Crude Oil Purchasing, Inc.*, 103 B.R. 256 (Bankr.N.D.Okla.1989) (fraudulent transfer claim).

In amending the post-judgment interest statute, Congress indicated that its provision for an "IRS prime" rate of interest in the amended 28 U.S.C. § 1961 was an appropriate *uniform formula* for compensating plaintiffs for the loss of the use of funds *during the pendency of the litigation*. See, e.g., *In re Fulghum Constr. Corp.*, 78 B.R. 146, 154 (M.D.Tenn.1987); *Matter of Foreman Industries, Inc.*, 59 B.R. 145, 156–57 (Bankr.S.D.Ohio 1986); *In re H.P. King Co., Inc.*, 64 B.R. 487, 490–92 (Bankr.E.D.N.C.1986).

According to the official table of interest rates used pursuant to 28 U.S.C. § 1961, the rate as of May 27, 1986 (the date of demand) was 6.56%; the rate as of January 10, 1991 was 6.62%.[15] Interest awarded under 28 U.S.C. § 1961 is compounded *annually*, not semi-annually as is urged by the Trustee. Furthermore, the Trustee's argument that the rate of prejudgment interest should be periodically adjusted to

---

**14.** The Creditor Trustee submits, as set forth above, that prejudgment interest should run from the time ABC obtained the preferences in March 1983. He further argues that even if the Court were to grant prejudgment interest from May 27, 1986, when the Creditor Trustee demanded return of the preferences, the Court should still award prejudgment interest at the prime rate. In this way, the Court will at least limit ABC's windfall profits on the preferences.

*Compare* item 3 of Exhibit 1 (prejudgment interest at the prime rate from May 27, 1986) *with* item 4 thereof (prejudgment interest at the federal post-judgment rate from May 27, 1986).

**15.** The rate as of January 10, 1991 was the rate in effect as of February 12, 1991, the date of payment by ABC of the principal $1,550,000.

reflect changes in interest over the relevant period of time is contrary to the policy expressed by Congress when it amended 28 U.S.C. § 1961 and has been specifically rejected in the application of awarding prejudgment interest:

"* * * The problems with any such calculation are readily apparent. They were undoubtedly apparent to Congress when 28 U.S.C. § 1961 was passed, because Congress specified that the judgment should bear interest at the price established by the last auction immediately prior to the date of judgment. *Congress having stated that post-judgment interest should not fluctuate,* it seems only logical that *prejudgment interest should not fluctuate.*" (Emphasis supplied.)

*In re Missionary Baptist Foundation of America,* 69 B.R. 536, 539 (Bankr.N.D.Tex. 1987). *See Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 110 S.Ct. 1570, 1577–78, 108 L.Ed.2d 842 (1991) (single rate applicable for duration of post judgment interest accrual).

The authorities relied upon by the Trustee in support of his argument for using a commercial prime rate are not applicable to preferences avoided under 11 U.S.C. § 547. The recovery of a defendant's profit (*i.e.,* interest earned by the defendant on a principal sum) may be appropriate in situations involving breaches of fiduciary duty, patent infringements and other culpable acts which were tortious or unlawful at the time they were committed.[16] However, there is no basis for such relief in ordinary preference actions involving transfers which are lawful when made and which continue to be lawful unless the Trustee elects to avoid them. *Smith v. Mark Twain National Bank,* 805 F.2d 278, 291 (8th Cir.1986).

Moreover, prejudgment interest is intended to compensate the estate for what *it* would have earned on the same principal amount if the alleged preference had been returned on demand. *Id.* In the exercise of his fiduciary duty, the Trustee could not have invested the estate's money at prime rates because of the corresponding risks.[17] Nevertheless, ABC is asked to be the guarantor of such investments during the period of delay in bringing and concluding this case. *Williamson v. Handy Button Mach. Co.,* 817 F.2d 1290, 1298 (7th Cir.1987) ("delay in filing suit might be ... a *reason [making prejudgment interest inappropriate],* because delay shifts the investment risks to the defendant, allowing the plaintiff to recover interest without bearing the corresponding risk.").

The Trustee argues that prime rate of interest is necessary "to compensate the Estate for the 'risk' that ABC will 'default' in paying any prejudgment interest awarded against it." The Trustee further maintains, "this risk is real" because Standard & Poor's rating of ABC's long term debt and CDs was reduced in January from

---

**16.** Authorities cited by the Trustee are distinguishable from preference actions in bankruptcy: *Jefferson Nat. Bank v. Central Nat. Bank in Chicago,* 700 F.2d 1143 (7th Cir.1983) (breach of fiduciary duty); *Katsaros v. Cody,* 744 F.2d 270 (2d Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984) (breaches of fiduciary duty); *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629 (W.D.Wisc.1979) (same); *Employer Teamsters, Joint Council No. 84, Health and Welfare Fund v. Weatherall Concrete, Inc.,* 468 F.Supp. 1167 (S.D.W.Va.1979) (defendant knowingly underpaid its obligations to a pension fund); *Peterson v. Crown Financial Corp.,* 553 F.Supp. 114 (E.D.Pa.1982) (restitution of wrongfully withheld release funds); *Gorenstein Enterprises Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431, 436 (7th Cir.1989) (franchisee's intentional and outrageous refusal to cease illegal use of trademark); *Alberti v. Klevenhagen,* 896 F.2d 927 (5th Cir.1990) (defendants threatened stone-

walling if fee applications were made); *General Facilities, Inc. v. National Marine Service, Inc.,* 664 F.2d 672 (8th Cir.1981) (admiralty suit to which the defendant had no defense); *Lemelson v. Mattel, Inc.,* 1990 WL 16785, 1990 U.S. Dist. LEXIS 1267 (N.D.Ill.1990) (16 years of willful patent infringement and an extended litigation of highly dubious merit); *Datascope Corp. v. SMEC Inc.,* 1988 WL 88049, 1988 U.S. Dist. LEXIS 9245 (D.N.J.1988) (patent infringement); *Studiengesellschaft Kohle m.b.H. v. Dart Industries,* 666 F.Supp. 674 (D.Del.1987) (same); *Zurich Ins. Co. v. Pateman,* 692 F.Supp. 371 (D.N.J. 1987) (parties stipulated to an applicable interest rate).

**17.** The risks associated with loans at prime or higher rates of interest obviously include the risk of default by the borrower, a risk which is exemplified by this entire bankruptcy proceeding and those of the Debtor's affiliates.

"A–" to "BBB". The argument is frivolous. While the rating was so reduced, a "BBB" rating is still an investment grade rating under the Standard & Poor's system. ABC has promptly paid the principal amount of the preferences pursuant to the order of this Court and any suggestion by the Trustee that a risk of non-payment exists which might justify an inflated rate of prejudgment interest is unfounded.

The Trustee also claims in a footnote to his Exhibit 1 that the $1,550,000 paid by ABC pursuant to this Court's orders of January 25, January 30 and February 15, 1991 should be applied first to any prejudgment interest due and that interest should continue to run on any unpaid balance of principal due after such application. This argument, too, is unfounded. The orders of this Court dated January 25, January 30 and February 15, 1991 expressly state that the *$1,550,000* to be paid by ABC represents *"the principal amount of the two voidable preferences* it received from the Debtor." That principal sum was deposited in an *interest-bearing account.* Any interest earned on that account should be applied to any award of prejudgment interest made by this Court. Interest liability of ABC, therefore, should not continue to accrue after the date on which the principal was paid because the estate had been compensated with the principal amount of its claim. The authorities cited by the Trustee in the footnote to Exhibit 1 are inapplicable because they merely address situations in which a debtor pays a sum to its creditor which is not specifically allocated to principal or interest. As the Court of Appeals stated in *Aviation Credit Corp. v. Conner Airlines, Inc.,* 307 F.2d 685, 688 (5th Cir. 1962), *cert. denied, Conner Airlines, Inc. v. Aviation Credit Corp.,* 371 U.S. 954, 83 S.Ct. 510, 9 L.Ed.2d 501 (1963), the authority cited by the Trustee, the issue of whether and how a payment should be allocated to principal and/or interest "must be determined in accordance with the real or presumed intention of the parties." Here the real intentions of the parties and of this Court are expressly stated in the orders of this Court dated January 25, January 30 and February 15, 1991, to wit: that the

$1,550,000 paid by ABC entirely satisfies the *principal* preference liability.

The Trustee's assertion that the facts of this case fall squarely under the reasoning of *Gorenstein Enterprises v. Quality Care–USA,* 874 F.2d 431 (7th Cir.1989) is totally unfounded. *Gorenstein* was an action for franchise royalties and trademark infringement "where the violation was intentional, and indeed outrageous," where the defendants "had committed perjury in answering interrogatories" and where defendants had committed "a shameful abuse of process." *Id.* at 436–37. None of these considerations are applicable to preference actions generally, nor to the merits of this case in particular. ABC was the victim of fraud and good faith recipient of the transfers. ABC was the prevailing party throughout this litigation, except with respect to the reversal by the Court of Appeals in these two preferences, and ABC has already paid the principal amount of the judgment.

## EQUITABLE CONSIDERATIONS FOR REDUCTION OF PREJUDGMENT INTEREST

### ABC's Arguments For Equitable Reduction Of Prejudgment Interest

A determination of whether to award any prejudgment interest requires consideration of equities including such factors as the merits of the underlying action, whether the amount of defendant's liability could have been determined at the outset, the causes of any delays in bringing the case to resolution, and the avoidance of punitive measures. *Osterneck v. Ernst & Whinney,* 489 U.S. 169, 176, 109 S.Ct. 987, 991, 103 L.Ed.2d 146, 155 (1989) (court must examine matters encompassed within the merits of the underlying action); *Blau v. Lehman,* 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962), ("The cases teach that interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable."); *Osterneck v. E.T. Barwick Industries, Inc.,* 825

F.2d 1521, 1536 (11th Cir.1987), *aff'd sub nom Osterneck v. Ernst & Whinney, supra; Parker Towing Co. v. Yazoo River Towing, Inc.,* 794 F.2d 591, 594 (11th Cir. 1986); *In re Bellanca Aircraft Corp.,* 850 F.2d 1275, 1281 (8th Cir.1988); *In re Art Shirt Ltd., Inc.,* 93 B.R. 333, 341–42 (E.D. Pa.1988), *aff'g,* 68 B.R. 316, 324 (Bankr.E. D.Pa.1986).

In *Osterneck v. E.T. Barwick Indust. Inc.,* 825 F.2d 1521 (11th Cir.1987), *aff'd, sub nom Osterneck v. Ernst & Whinney,* 489 U.S. 169, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989), the Court of Appeals affirmed a *two-thirds reduction* in prejudgment interest by the district court which had considered an *interest award in excess of the principal sum of the judgment to be punitive* and which also found that a substantial portion of the delay in bringing the suit to conclusion, as in the instant case, was attributable either to actions the plaintiffs had taken or to *delays inherent in the federal judicial system.* Emphasizing that *"the district court must insure that the award is not punitive in nature,"* the Court of Appeals stated (825 F.2d at 1536):

> " * * * Finally, because the award of prejudgment interest is compensatory rather than punitive, the award must be 'tempered by an assessment of the equities.' [citing *Norte & Co. v. Huffines,* 416 F.2d 1189, 1191 (2d Cir.1969), *cert. denied,* 397 U.S. 989 [90 S.Ct. 1121, 25 L.Ed.2d 396] (1970).] It is apparent to us that the factors relied upon by the district court are *precisely the sorts of equitable considerations which should be evaluated* in making a prejudgment interest award." (Emphasis supplied.)

So, too, in *Parker Towing Co. v. Yazoo River Towing, Inc.,* 794 F.2d 591 (11th Cir.1986), the Court of Appeals found no abuse of discretion in entirely denying prejudgment interest where the trial court had

found that there had been a *"genuine dispute regarding liability."*

"In this case, the district court failed to enumerate its reason for denying prejudgment interest. *Nonetheless, we find no abuse of discretion* because a peculiar circumstance—*the existence of a genuine dispute regarding liability*—is present." 794 F.2d at 594. (Emphasis supplied.)

*Accord: In re Bellanca Aircraft Corp.,* 850 F.2d 1275, 1281 (8th Cir.1988) (the amount of the preferential transfers were affected by new value defenses); *In re Art Shirt Ltd., Inc.,* 93 B.R. 333, 341–42 (E.D. Pa.1988), *aff'g,* 68 B.R. 316, 325 (Bankr.E. D.Pa.1986) (defendant's opposition on the insolvency issue was "hardly frivolous" and the four-year delay in litigating the matter to a conclusion was primarily due to the court's deliberative process and the trustee's delay).

The present litigation was aptly described by the bankruptcy court as arising from a "blizzard of charges based upon alternative theories, denials and affirmative defenses, raising, I think, every conceivable factual and legal argument." Bkr. Ct. Op. at 2. Resolution of many of the issues turned on novel legal issues which could not be ascertained as of the date of demand.[18]

Moreover, overreaching by the Trustee based upon novel theories of recovery, so apparent in the present motion, has permeated in these proceedings throughout five years of litigation. The Trustee's original complaint demanded the return of over *$9 million* in allegedly voidable transfers. The delay attributable to the Trustee's inflated claims is in itself grounds for denying prejudgment interest. *Osterneck v. E.T. Barwick Indus. Inc., supra; In re Windsor Communications Group, Inc.,* 80 B.R. 712, 724 (Bankr.E.D.Pa.1987),

---

**18.** These post-demand decisions included *In re Sublett,* 895 F.2d 1381 (11th Cir.1990); *In re Chase & Sanborn Corp. (Nordberg v. Societe Generale),* 848 F.2d 1196 (11th Cir.1988); *In re Air Conditioning, Inc. of Stuart,* 845 F.2d 293 (11th Cir.), *cert. denied,* 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988); *Matter of Fuel Oil Supply & Terminaling, Inc.,* 837 F.2d 224 (5th Cir., 1988) (on the basis of which the 11th Circuit overruled a decision of M.D. Fla. relied upon by the district court in this case); *Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890 (7th Cir.1988); *In re Columbia Data Products, Inc.,* 892 F.2d 26, 29 (4th Cir.1989).

("We decline to award any prejudgment interest to the Debtor because we believe that its own, *overblown claim for approximately $1,500,000.00* on the First Count [on which the Debtor was deemed entitled to recover $123,540.00] *led to its delay in settlement of and hence receipt of the proceeds from this claim.*") (Emphasis supplied.)

Finally, and perhaps most importantly, this Court should consider the good faith of ABC on the merits of the challenged transfers, as found by the trial court and reiterated by the District Court and the Court of Appeals, and the undisputed fact that the transfers were partial repayments of a loan which had initially been procured by the fraud of the Debtor's President and Chairman. To require ABC to pay five to eight years of prejudgment interest on money that was wrongfully taken from ABC in the first place would constitute an inequitable penalty.

\*　　\*　　\*

*The Court's Opinion Respecting How Prejudgment Interest Should Be Calculated*

 The Court is of the opinion that prejudgment interest should be calculated at the prime rate as stated in the Wall Street Journal, calculated at six month intervals from date of demand, May 27, 1986 until February 13, 1991. Interest shall be compounded each six months. Interest shall also be paid at prime rate on the amount of the unpaid interest from February 13, 1991 until paid.

*ABC's Arguments Respecting The Counterclaim*

Entry of judgment on the Trustee's claims and awarding interest thereon before adjudicating the issues remaining on ABC's counterclaim, would be premature and contrary to the policies underlying Bankruptcy Rule 7054 and Fed.R.Civ.P. 54(b). ABC's counterclaim alleges that the Debtor and its principals defrauded ABC of millions of dollars by the use of false financial statements and false bills of lading. Although the Trustee claims that there are no issues to be tried on the counterclaim and maintains that the Bankruptcy Court previously denied ABC's claim on the merits, the decision of the bankruptcy court does not so state and contains no findings of fact on the counterclaim. The bankruptcy court held that the counterclaim should be *considered only as a setoff* and was therefore *"moot" because there had been no judgment in the Trustee's favor against which a setoff could apply* against ABC's liability to the Trustee. Bankr. Ct. op. at 13. *The Trustee did not appeal the Bankruptcy Court's ruling.*

At trial the Trustee conceded, and the Court of Appeals has duly noted, that the Debtor's financial statements on which ABC relied in loaning $22 million were materially false and misleading.[19] He has subsequently stipulated that bills of lading which ABC relied in loaning an additional $3.3 million were false and fraudulent.[20] Furthermore, both ABC and the Trustee introduced into evidence at trial the deposition testimony of the Debtor's President, Camilo Bautista, which is replete with undisputed testimony concerning the Debtor's fraudulent acts and fraudulent intent.[21] In addition, ABC's vice-president Tilney testified at trial to the issues of reliance by ABC, to its detriment, on the false financial

---

**19.** *In re Chase & Sanborn Corp., supra,* 904 F.2d at 591. The Trustee's accountant testified that in his opinion the Debtor was insolvent as of October 1, 1982 in the range of approximately $36 million to $40 million. Trial testimony of Soneet Kapila (Tr. 49). The Debtor's audited financial statements as of September 30, 1982 show assets of $63.7 million and liabilities of only $26.9 million. (Deft's Trial Ex. O.) The Trustee also placed in evidence the deposition of the Debtor's President, Camilo Bautista, who admitted under oath that the financial statements and others presented to ABC at the time

of the loans were false and misleading. (Pltf's Trial Ex. 13, Deft's Trial Ex. S at 13–21, 36–40.)

**20.** Stipulation Relating to Claims of Arab Banking Corporation, paragraphs 18–21 (May 13, 1988), a copy of which is annexed as Exhibit E to ABC's Memorandum in Opposition to Trustee's Motion under Bankruptcy Code Section 502(d) (December 20, 1990).

**21.** Pltf's Trial Ex. 13, Deft's Trial Ex. S, Deposition of Camilo Bautista (Sept. 2, 1986) at 13–21, 25–40, 76–80, 94–97.

statements and bills of lading.[22]

The Court of Appeals, after reversing the bankruptcy court on the two preferential transfers, recognized that no findings of fact had been made on the counterclaim because neither the bankruptcy court nor the district court had awarded any affirmative relief to the Trustee (904 F.2d at 593 n. 9):

> "The bankruptcy court, noting that there appeared to be no evidence supporting the claim, found it to be time-barred except as a *possible offset to any recovery obtained by Chase & Sanborn. See* Bankr.Ct.Op. at 13. *Because the bankruptcy and district courts denied any recovery to Chase & Sanborn, neither court had occasion to discuss the counterclaims further."* (Emphasis added.)

Indeed, the Court of Appeals directed that ABC's counterclaim be resolved *"in the first instance"* upon remand to this Court. *In re Chase & Sanborn Corp., supra,* 904 F.2d at 593 n. 9, 600. There would have been no reason for the Eleventh Circuit to remand for further consideration of the counterclaim if the merits of ABC's counterclaim had, as the Trustee now contends, been adjudicated by the bankruptcy court.

The Trustee claims that because neither the district court nor the Court of Appeals expressly reversed Judge Britton's ruling on the counterclaim, the matter has now been finally disposed of. This misinterpretation of events and the appellate process entirely ignores the express statement of the Court of Appeals as to the reasons why no reversal was made. The Court of Appeals was not in a position to review the merits of the counterclaim because no findings had been made below. On this remand, the present absence of findings of fact must be corrected.

The present review of ABC's counterclaim and the making of appropriate find-

ings should be consolidated with the related retrial of ABC's Supremo Loan and constructive trust claims, which have recently been remanded by the district court to this Court over the Trustee's vigorous objection, for further findings, on an amended proof of claim, on the factual issue of whether there is a sufficient link between the Debtor, as an entity, and the frauds which its Chairman, President, and Comptroller admittedly perpetrated on ABC.[23] At that trial, in addition to other evidence of fraud and damages, ABC will offer the testimony of the Debtor's former Comptroller who was an active participant in the fraud.

Both claims have common issues of law and fact and would entitle ABC to a setoff or netting against its preference liability to the Trustee. *Curtiss–Wright Corp. v. General Electric Co.,* 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980); *Page v. Rogers,* 211 U.S. 575, 581, 29 S.Ct. 159, 161, 53 L.Ed. 332 (1909); *Matter of Davis,* 889 F.2d 658, 659, 662 (5th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 2175, 109 L.Ed.2d 504 (1990); *Walker v. Wilkinson,* 296 F. 850, 853 (5th Cir.1924), *cert. denied,* 265 U.S. 596, 44 S.Ct. 639, 68 L.Ed. 1198 (1924). This Court's January 30, 1991 Section 502(d) order recognizes the importance of preserving the status quo until those setoff claims are fully adjudicated. *Matter of Davis, supra; Texas Consumer Finance Corp. v. First National City Bank,* 365 F.Supp. 427, 432 (S.D.N.Y.1973).

The consolidation of these related proceedings would eliminate unnecessary repetition, duplicative expenditure of resources of counsel and the court, and would eliminate the risk of prejudice and inconsistent findings. These are precisely the concerns for which the trial courts have been urged to make good use of consolidation. *Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492, 1495 (11th Cir.1985); *Dupont v.*

---

**22.** Testimony of S. Tilney (Tr. 78–81, 85, 94–104, 112–113, and 120.)

**23.** *See* Memorandum Opinion of district court on cross-appeals in "Arab II" (Case No. 88–1539–Civ–Scott Oct. 18, 1990) and Order granting Motion to Strike and Denying Motion for Reconsid-

eration or Order Certifying Appeal (Case No. 88–1539–Civ–Ryskamp Jan. 18, 1991). Copies of these orders are annexed as exhibits to ABC's Memorandum and Supplemental Memorandum filed in opposition to the Trustee's § 502(d) motion.

*Southern Pacific Co.,* 366 F.2d 193, 195 (5th Cir.1955), *cert. denied,* 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 106 (1967).

The Trustee argues that ABC's counterclaim is time-barred by the confirmation of the Debtor's Plan of Reorganization.[24] However, under a *liquidating* Plan of Reorganization, as is the Plan in this case, there is *no discharge* of the Debtor and the Plan's provisions do not bind creditors or holders of equity interests in property in the debtor's possession. 11 U.S.C. § 1141(a), (c), (d)(3); *United States v. Gurwitch (In re Gurwitch),* 794 F.2d 584 (11th Cir.1986); 5 Collier on Bankruptcy ¶ 1141.01[4][c] (15th ed. 1988). The Trustee's new argument that adjudication of the counterclaim would be tantamount to "treat[ing] the plan as a nullity" is nonsense. Even the Trustee conceded in his answer to the counterclaim (filed on the date of trial) that ABC's counterclaim was already encompassed in ABC's proof of claim filed in November 1983, months before the bar date:

> *"The alleged counterclaim is already the subject matter of a proof of claim filed by Defendant in the main case,* which is subject to a pending objection; this adversary proceeding is procedurally the wrong forum to assert it." (Answer and Affirmative Defenses to Counterclaim, par. 3, emphasis supplied.)

*In re General Coffee Corp.,* 85 B.R. 905 (Bankr.S.D.Fla.1988), which the Trustee cites as authority for his argument concerning the bar of the Plan, is inapposite. That case concerned a constructive trust claim to assets which were being sold under the Plan. The creditor, Trustee and the Court had agreed as to what the dollar amount of that creditor's claim should be, provided that there were legal grounds to support it. No such agreement or order exists with respect to ABC's counterclaim.

Furthermore, the bankruptcy court in this adversary proceeding has previously held that even if time-barred, the counterclaim could be considered "as an offset against any recovery affected by the plaintiff against this defendant. *Slaw Construction Corp. v. Hughes Foulkrod Construction Company (In re Slaw Construction Corp.),* 17 B.R. 744, 748 (Bankr.E.D. Pa.1982)." Bkr.Ct.Op. at 13. The *Slaw* case, relied upon by Judge Britton, emphatically states:

> " * * * [E]ven if its counterclaim is a debt which has been discharged by the confirmation of the debtor's plan [the defendant] *may nevertheless assert* that *counterclaim as a setoff* or defense to the debtor's complaint to the extent that that complaint is based on a transaction which occurred before the filing of its petition for a reorganization." (Emphasis supplied.)

The Trustee did not appeal Judge Britton's holding that the counterclaim may be used as a setoff, and ABC showed the district court on its own appeal that the suggestion that the claim was barred because not filed before January 16, 1984 was clearly erroneous.

The Trustee's request that judgment be entered on his claims under Bankruptcy Rule 7054 prior to adjudication of the remanded counterclaim and Supremo Loan claim should be denied. Entry of a judgment at this juncture on one-half of this case, but not the other half, could result in piecemeal appeals contrary to the interests of sound judicial administration. *Smith v. Zant,* 887 F.2d 1407, 1418–19 (11th Cir. 1989). Furthermore, the fraudulent conduct of the Debtor and its principals, as alleged in ABC's counterclaim and as has been conceded in part by the Trustee, is clearly a relevant factor in denying or reducing any prejudgment interest on the

---

**24.** The Trustee also made the same ill-founded objection before the District Court to consideration of ABC's constructive trust claim in the companion contested claims proceeding, *"Arab II"*. The argument was properly brushed aside by Judge Scott on October 18, 1990 when he ordered that *"Arab II"* should be remanded to

this Court for further findings based on an amended proof of claim. After full briefing and oral argument, Judge Ryskamp denied reconsideration of Judge Scott's decision and denied certification of an immediate appeal. (Order January 18, 1991 in *"Arab II"*.)

preference claim. *Osterneck v. Ernst & Whinney, supra.*

However, if this Court elects to enter either a non-final order or a final judgment pursuant to Bankruptcy Rule 7054(a) on the preference and prejudgment interest matters, the amount of prejudgment interest liability, if any, should be held with the principal preference liability in the interest-bearing segregated account that was established pursuant to this Court's January 30, 1991 Section 502(d) order pending the ultimate disposition of ABC's counterclaim and Supremo Loan and constructive trust claims.

### The Creditor Trustee's Arguments Respecting the Counterclaim

For the reasons set forth below, the Creditor Trustee asks that the Court enter final judgment in this proceeding in favor of the Estate dismissing ABC's $11 million fraud counterclaim and awarding the Estate the amount of prejudgment interest set by the Court. In the alternative, if the Court declines to dispose of the counterclaim at this time, the Creditor Trustee requests that the Court sever the counterclaim and enter a separate judgment awarding prejudgment interest on the preferences pursuant to Bankruptcy Rule 7054(a) and Federal Rule of Civil Procedure 54(b).

After a full trial of this adversary proceeding, Judge Britton made findings of fact expressly rejecting the counterclaim on its merits:

> "*I shall confine my discussion to those points I find dispositive.* This does not mean that I have ignored or rejected every other contention, merely that this court's caseload precludes more exhaustive treatment.

> "*I shall recite only those facts pertinent to the dispositive issues.*
>
> \* \* \* \* \* \*
>
> "*Defendant has ignored its counterclaim in its trial memorandum and its supplemental trial memorandum. I am not aware of any evidence in this record offered in support of the counterclaim.* If it has not been abandoned by defendant it has been rendered moot by the remaining decisions reached in this order. The claims' bar date in this bankruptcy was January 16, 1984. This claim is barred, therefore, except as an offset against any recovery affected by the plaintiff against this defendant. *Slaw Constr. Corp. v. Hughes Foulkrod Constr. Co. (In re Slaw Construction Corp.),* 17 B.R. 744, 748 (Bankr.E.D.Pa. 1982). *Defendant is entitled to no relief upon its counterclaim.*"

Bankr. Dec., dated September 19, 1986, at 2 and 13. (CP 31) (emphasis added). Despite appeals by ABC, no appellate court has ever reversed, vacated or even criticized these findings of fact.

What Judge Britton's decision plainly says is that he confined himself to consideration of the "dispositive facts" and "dispositive issues," and that, among the dispositive facts and issues, he found that ABC "ignored" its own counterclaim and did not offer "any evidence" into the record in support of the counterclaim.[25] Based on these findings, among other reasons, Judge Britton concluded that ABC was "entitled to no relief upon its counterclaim", i.e., he rejected the counterclaim on the merits.

ABC, however, contends that Judge Britton made no findings of fact on and never reached the merits of the counterclaim.[26] ABC reads Judge Britton's decision to say, in effect, that he did not have to and was

---

**25.** The record bears out that ABC offered no evidence in support of the counterclaim. When Sheldon Tilney, ABC's bank officer, was asked at trial if he believed the Debtor had participated in a fraud against ABC, he testified: "I would say that we were defrauded by Mr. Duque and Mr. Bautista; *I don't know whether we were defrauded by General Coffee [i.e., the Debtor].*" Trial transcript at 113–14. Given ABC's own equivocal testimony, it is little wonder Judge Britton found that ABC was "entitled to

no relief" on its fraud counterclaim against the Debtor.

**26.** ABC incorrectly claims that the Creditor Trustee never denied the allegations of the counterclaim. In fact, the Creditor Trustee filed an answer to the counterclaim in which he denied all of the allegations thereof and asserted affirmative defenses. *See* Answer and Affirmative Defenses To Counterclaim (CP 27).

not reaching the merits of the counterclaim because it was rendered moot by other rulings in the decision. This contention by ABC depends on a cramped reading of the decision. It equally depends on ABC blinding itself to the arguments it advanced on the appeals from the decision.

ABC reads Judge Britton's reference to mootness as the *only* basis on which he ruled on the counterclaim. Read fairly and as a whole, the decision sets forth a number of *alternative* grounds why ABC is "entitled to no relief upon its counterclaim," including among those grounds that ABC had ignored its counterclaim and offered no evidence to support it and that, in any event, the counterclaim was *otherwise* moot.

On the parties' subsequent appeals to the District Court and the Eleventh Circuit, Arab directly challenged Judge Britton's adverse findings of fact on its counterclaim. *See* Arab's Brief in Eleventh Circuit, dated July 23, 1989, at 43–44 and 47–49; Arab's Supplemental Brief in the District Court, dated April 13, 1987, at 33–38; Arab's Reply Brief in the District Court, dated May 12, 1987, at 6–8. If ABC genuinely believed that Judge Britton had not ruled against its counterclaim on the merits, it would have had no reason to attack his adverse findings of fact. Further, ABC would have had no reason or standing to *cross-appeal* (as it did) from Judge Britton's decision if it truly believed that all Judge Britton held was that his other rulings on the Creditor Trustee's claims rendered it unnecessary for him to reach the merits of the counterclaim. Under ABC's current interpretation of Judge Britton's decision, it would not have been a party aggrieved by that decision with standing to appeal from it. The fact that ABC did appeal the ruling on the counterclaim undermines its efforts now to reconstrue that ruling. The reading of Judge Britton's decision that ABC advanced on appeal is far more credible than its present about-face before this Court in an effort to evade Judge Britton's findings by pretending that he never made them.

Significantly, ABC failed to persuade either the District Court or the Eleventh Circuit to reverse Judge Britton's findings as "clearly erroneous." The Eleventh Circuit held merely that Arab "has not explained the nature or basis of the claim before this Court, and we are not in a position to analyze its merits." 904 F.2d at 593 n. 9. The confusion Arab engendered through its failure to articulate any grounds for upsetting the findings of Judge Britton resulted in the Eleventh Circuit stating: "We therefore leave *any remaining* issues involving the counterclaim to be resolved in the first instance by the bankruptcy court on remand." *Id.* (emphasis added). But, the Eleventh Circuit (as well as the District Court) did *not* vacate or find any fault with Judge Britton's findings of fact on the counterclaim.

In a final attempt to avoid Judge Britton's findings, ABC claims that the Eleventh Circuit was of the view that the counterclaim was still viable because otherwise it would not have remanded the counterclaim. This reading of the Eleventh Circuit's decision, parallel to ABC's reading of Judge Britton's decision, depends on ABC's failure to read the Eleventh Circuit's decision fairly and as a whole and on a self-serving blindness to what it argued on the appeals from Judge Britton's decision. Fairly read, the Eleventh Circuit decision says no more or less than that due to ABC's failure to "explain[ ] the nature or basis of the claim" the Court was unable to analyze the counterclaim and its status and instead left that to the Bankruptcy Court. While ABC argues that the Eleventh Circuit must have had something specific in mind when it remanded the counterclaim, if the Court did, it would have said so. Instead, the Court said precisely what it concluded: the inadequacy of ABC's arguments left it unable to determine what, if anything, should be done with the counterclaim and the Circuit Court left that determination to this Court. Most importantly, the Eleventh Circuit did *not* overturn Judge Britton's findings adverse to the counterclaim even though ABC challenged those findings—and ABC plainly would not and could not have challenged the findings

unless they were in Judge Britton's decision and against it. As ABC left the Eleventh Circuit in the dark about the counterclaim, ABC was unable to obtain the necessary appellate ruling (i.e., a reversal of the findings of fact as clearly erroneous) that it now needs to prevail.

There is, therefore, nothing further for the Court to do respecting the counterclaim except to enter judgment in favor of the Creditor Trustee because the unreversed factual findings of Judge Britton are dispositive of that claim. ABC tried its counterclaim before Judge Britton and lost. It had the burden on appeal to show that the adverse findings of fact made by Judge Britton were "clearly erroneous." Those adverse findings of fact—coupled with ABC's failure to overturn them on appeal—are fatal to its counterclaim. This Court cannot sit as an appellate court and review under the "clearly erroneous" standard findings of fact by a coordinate judge of the Bankruptcy Court. The time for ABC to have obtained such review was on the prior appeals through the Eleventh Circuit. Although ABC challenged Judge Britton's findings, it did not succeed in upsetting them. As Judge Britton expressly found, and no court has disagreed with, there is "not ... any evidence in this record offered in support of the counterclaim," and therefore "[ABC] is entitled to no relief upon its counterclaim." Bankr. Dec., dated September 19, 1986, at 13. ABC had its chance at trial to make its case on its counterclaim and failed to do so. There is no basis or justification for this Court going back to the counterclaim.[27]

The Creditor Trustee's position is also supported by this Court's January 30, 1991 decision on the Creditor Trustee's Section 502(d) motion, which read Judge Britton's decision as the Creditor Trustee asserts that it should be read. In its January 30 decision (at 7), this Court stated, "In his decision Judge Britton found that there was no evidence to support the counterclaim ..." and then further stated, "Given that Judge Britton found that the counterclaim was unproven...."

Separately, ABC's counterclaim should be dismissed on the independent ground that ABC did not assert the counterclaim until August 27, 1986, which was more than two years after the confirmation of the Debtor's plan of reorganization on August 3, 1984. It is well-settled that the confirmation of the plan stands as a *res judicata* bar to the untimely assertion of ABC's counterclaim. *See, e.g., Miller v. Meinhard Commercial Corp.*, 462 F.2d 358 (5th Cir.1972); *In re Constructors of Florida, Inc.*, 349 F.2d 595, 599 (5th Cir. 1965), *cert. denied*, 383 U.S. 912, 86 S.Ct. 886, 15 L.Ed.2d 667 (1966); *In re General Coffee Corp.*, 85 B.R. 905, 906–07 (Bankr.S. D.Fla.1988); *In re Newport Offshore, Ltd.*, 78 B.R. 383 (Bankr.D.R.I.1987); *see also* 11 U.S.C. § 1141(a) ("... the provisions of a confirmed plan bind the debtor ..., and any creditor [among others], whether or not the claim or interest of such creditor ... is impaired under the plan and whether or not such creditor ... has accepted the plan."). It would be highly prejudicial and unfair to the Estate's other creditors to permit ABC to assert belatedly an $11 mil-

---

27. ABC also claims that it is entitled to a *new trial* of the counterclaim. As discussed, the Creditor Trustee contends that the counterclaim has been disposed of on the merits. Even were this Court to disagree, ABC would not be entitled to a new trial. It tried the counterclaim and the record is closed. It has *never* argued that it was precluded from introducing any evidence at the trial or that there were any errors in the trial that would require another trial. Nor has any appellate court found any such errors or held that ABC is entitled to a new trial. Thus, even if the Court were to accept ABC's interpretation of Judge Britton's September 19, 1986 decision—which the Creditor Trustee vig-

orously disputes—ABC at most would be entitled to additional findings on the trial record, if any, that it marshalled in support of the counterclaim. In no event would ABC be entitled to a new trial.

What ABC seems to argue is that a stipulation of the parties in the contested matter in this bankruptcy case (hereinafter *"Arab II"*) supports its counterclaim. But *Arab II* was tried almost *two years after* this proceeding was tried. Even assuming the stipulation helps ABC (which the Creditor Trustee disputes), it would be patent error for ABC to use evidence (i.e., the stipulation) from that much later case to expand the closed record in this proceeding.

lion fraud claim that ABC failed to disclose to them when they voted on the plan.[28]

ABC claims, however, that established precedent does not govern here because this case involves a "liquidating" plan of reorganization. The only case cited by ABC in support of this claim is *United States v. Gurwitch, (In re Gurwitch)*, 794 F.2d 584 (11th Cir.1986), which is plainly inapplicable in that it involved post-bankruptcy proceedings on a nondischargeable tax debt to the IRS in an individual's bankruptcy under Chapter 7. Proceeding against the debtor on a nondischargeable debt after he emerges from bankruptcy is different than asserting new claims against the bankruptcy estate after confirmation of the plan; the former does not diminish the estate and results in no prejudice to the other creditors, whereas the latter does. In short, ABC advances no authority for the proposition that (or reason why) a confirmed "liquidating" Chapter 11 plan is not binding on an estate and its creditors, or for the proposition that the creditors subject to such a plan may still assert new claims against the estate itself (to the detriment of the other creditors, who in ignorance of these new claims voted to confirm the plan). In substance, ABC would have this Court disregard the clear and unambiguous language of 11 U.S.C. § 1141(a), as well as disregard the creditors' vote on the plan of reorganization here and the Court's confirmation of it, and treat the plan as a nullity. To do so would be to change the essential facts (i.e., the claims against the

Estate) on which the creditors' vote and the Court's order confirming the plan were based. We are aware of no authority of any kind which would support such an extraordinary order by the Court. Indeed, in *In re General Coffee Corp., supra*, 85 B.R. at 906–07, Judge Britton in this very "liquidating" Chapter 11 held that a claim by another creditor, which was not covered by the Debtor's plan of reorganization and was submitted after confirmation, was barred by the doctrine of *res judicata.*

ABC also argues that the Creditor Trustee's contention that confirmation of the plan is a *res judicata* bar to the counterclaim has been rejected in this litigation. The argument seems to be that because Judge Britton said that the counterclaim might be an "offset" against any recovery by the Estate, Judge Britton was ruling that the principle of *res judicata* did not bar the counterclaim. In fact, while the Creditor Trustee raised his *res judicata* argument before Judge Britton (*see, e.g.,* Answer and Affirmative Defenses to Counterclaim at ¶ 2), Judge Britton's opinion does not reach the argument, much less reject it. Since Judge Britton awarded no recovery to the Estate, he could dispose of the "untimely" counterclaim without reaching the *res judicata* argument (i.e., as the Creditor Trustee recovered nothing in the Bankruptcy Court, there was nothing to setoff against the counterclaim, even if it could be an offset). As discussed above, this constitutes but one of several alternative rulings against the counterclaim.[29]

**28.** ABC's proof of claim asserted claims only against Duque and only based on his contractual defaults on loans by ABC to or guaranteed by him, such as ABC's loan to Supremo Coffee Co. (Claim No. 295). Nowhere in the proof of claim did ABC assert any claim or basis of liability against the Debtor or any fraud claim against anyone. It was only long after the confirmation of the plan of reorganization, as Judge Britton expressly found (Bankr. Dec., dated September 19, 1986, at 13 (CP 31)), that ABC in the counterclaim asserted for the first time a fraud claim against the Debtor.

**29.** While the Creditor Trustee argued on appeal that Judge Britton erred as a matter of law in his statement that the counterclaim might be an offset (*see, e.g.,* Creditor Trustee's Reply Brief in the Eleventh Circuit at 26 n. *), the Creditor

Trustee was not obliged to challenge this misstatement of law, as the Estate was not aggrieved by it inasmuch as the Creditor Trustee had prevailed against the counterclaim. The erroneous statement of law at most constituted a flaw in the reasoning of one of several alternative holdings, each of which reached the result sought by the Creditor Trustee (i.e., the dismissal of the counterclaim). Moreover, Judge Britton's statement—which is contrary to well established Fifth and Eleventh Circuit law (i.e., there is no right to an offset against a preference recovery by the trustee)—has since been corrected (with ABC's position on this issue squarely addressed and rejected) in this Court's January 30, 1991 decision on the Creditor Trustee's § 502(d) motion, which held in accordance with the well established law that ABC has no right to an offset here.

Judge Britton's silence on the *res judicata* argument (which provides yet another reason for dismissing the counterclaim) does not mean he rejected that argument. As he expressly said, his failure to discuss any particular argument "does not mean that I have ignored or rejected [it, but] merely that this court's caseload precludes more exhaustive treatment." Bankr. Dec., dated September 19, 1986, at 2 (CP 31).

In sum, the *res judicata* bar of the confirmed plan constitutes an additional reason, which no court has yet passed upon, for rejecting the counterclaim.[30]

Lastly, the Creditor Trustee argues alternatively that even if any further proceedings on ABC's counterclaim were justified, this is an appropriate case to enter a final judgment in favor of the Creditor Trustee for prejudgment interest pursuant to Bankruptcy Rule 7054(a), which makes Federal Rule of Civil Procedure 54(b) applicable to adversary proceedings. Entry of final judgment is appropriate in this case because "there is no just reason for delay." Fed.R.Civ.P. 54(b). The "claims under review are separable from the others remaining to be adjudicated" and "the nature of the claims already determined [is] such that no appellate court [will] have to decide the same issues more than once even if there [are] subsequent appeals." *Curtiss–Wright Corporation v. General Electric Company*, 446 U.S. 1, 8, 100 S.Ct. 1460, 1465, 64 L.Ed.2d 1 (1980); *see also Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1369 (11th Cir.), *rehearing denied*, 706 F.2d 318, *cert. denied*, 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983) (lower court properly held that unadjudicated claims were prac-

tically and logically distinct from those upon which judgment was entered); *Schroeter v. Ralph Wilson Plastics, Inc.*, 49 F.R.D. 323, 326 (S.D.N.Y.1969) (final judgment appropriate on claim independent in nature from other pending claims and counterclaims).

The Creditor Trustee's right to recover the preferences has been fully and finally adjudicated by the Eleventh Circuit. As the issues relating to the preferences cannot be appealed any further, they are not relevant to a Rule 54(b) determination. The only issues remaining—and thus the only potential matters for appeal—are what amount of prejudgment interest the Creditor Trustee is entitled to receive on the preferences and the disposition of ABC's counterclaim. These issues have no relation to each other, and, therefore, final judgment for prejudgment interest should be entered, even if judgment on the counterclaim is delayed.[31]

Nonetheless, ABC asks the Court to hold up the entry of judgment covering prejudgment interest on the ground that its $11 million fraud counterclaim and an ABC "constructive trust" claim in another proceeding (i.e., *Arab II*) are pending and should be decided together on a consolidated basis before the entry of judgment in order to avoid piecemeal and duplicative judicial proceedings. ABC's position is completely without merit.

As discussed, the counterclaim is factually and legally distinct from any issues relating to prejudgment interest. The same is true of ABC's constructive trust claim, which is not even asserted in or any part of

---

30. ABC's similar contention that the *res judicata* argument was rejected by the District Court in the *Arab II* proceeding is equally without merit. The decision of the District Court in *Arab II* held only that the Bankruptcy Court improperly denied ABC leave to amend and did not even mention the *res judicata* argument, let alone discuss or decide it. There, too, the Court did not reach the argument, and it remains open as an alternative basis for rejecting the counterclaim here.

31. ABC seems to argue that the prejudgment interest issue and the counterclaim have in common the question of whether ABC was defrauded. As previously set forth, ABC was defrauded

by Duque and Bautista, not the Debtor or its creditors. Moreover, the alleged common thread is just that—a thread, and a thin one at that. It would unfairly prejudice the Estate to hold up judgment on and collection of prejudgment interest simply because ABC conjured up a fanciful "argument" as to why there might be something in common, however remote, between the interest question and the counterclaim. The prejudice to the Estate and its creditors is particularly acute in light of ABC's rapidly declining credit rating, which imperils the future collectibility of the prejudgment interest if entry of judgment on it is delayed.

this adversary proceeding. That claim arises out of the Creditor Trustee's settlement of a claim he made in yet another entirely separate proceeding against Nabisco and has no conceivable bearing on prejudgment interest here. Moreover, ABC's contention that the counterclaim and the constructive claim should be consolidated and tried together before the entry of final judgment for prejudgment interest is simply an effort by ABC to confuse the Court and a pretext by it to avoid paying what it owes. The counterclaim was tried almost two years before the constructive trust claim was even asserted and then tried. The constructive trust claim involves critical facts and issues not involved at all on the counterclaim. The two claims were, in fact, tried on different records.

Entering a separate judgment in favor of the Creditor Trustee for prejudgment interest will only simplify and expedite this case and will not give rise to any piecemeal or duplicative judicial proceedings. It will also mitigate the ongoing credit risk to which the Estate is exposed due to ABC's rapidly declining credit rating and enable the Estate to collect money clearly owed to it sooner rather than later when such collection may be more difficult. In contrast, consolidating the counterclaim and the constructive trust claim and holding up final judgment until they are tried together would only add complexity and delay. The preference questions are already five years old. It is time to resolve them with finality.

ABC further claims that judgment covering prejudgment interest should be held up because it has a right to "setoff" its counterclaim and constructive trust claim against the amount of prejudgment interest awarded. This argument, too, is without merit. In its decision of January 30, 1991 on the Creditor Trustee's Section 502(d) motion, this Court expressly ruled that ABC may *not* setoff its counterclaim and constructive trust claim against the amount of the preferences (which, of course, includes interest thereon).

At all events, the entry of final judgment for prejudgment interest cannot possibly prejudice ABC. In connection with the Creditor Trustee's Section 502(d) motion,

the Court directed the Creditor Trustee to establish an interest-bearing segregated account to hold the preference amounts repaid by ABC. Prejudgment interest on the preferences will be deposited by the Creditor Trustee into the same segregated account, thereby assuring that nothing could possibly happen to those funds that would prejudice ABC.

In sum, regardless of the status and disposition of the counterclaim (as well as the constructive trust claim in the separate contested matter), a separate final judgment pursuant to Bankruptcy Rule 7054(a) and Federal Rule of Civil Procedure 54(b), should be entered in favor of the Creditor Trustee for the amount of prejudgment interest awarded.

*The Court's Opinion Respecting The Counterclaim*

■ The court is of the opinion that the counterclaim should be severed and adjudged separately from the matter of the preferences and their prejudgment interest. Arab Banking Corporation was required to return the preference in order to keep its claim from being disallowed. 11 U.S.C. § 502(d).

The court notes that the counterclaim has two distinct issues of res judicata or collateral estoppel: with relation to the existence of a confirmed plan, and the previous proceedings before Judge Britton. There is an issue as to whether the extent of the claim should be limited to the amount of the preference. A trial of this matter will indubitably reveal other issues. The court makes no finding in today's decision as to these issues. Today's ruling is simply that ABC must return its preference, with interest, as a predicate to attempting to pursue its claim.

Accordingly, it is

ORDERED that the Creditor Trustee's motion be and the same is hereby disposed of in accordance with the decisions of the Court set forth above.

DONE and ORDERED.